[No. S017701. Dec. 23, 1991.]

IT CORPORATION, Plaintiff and Appellant, v.
SOLANO COUNTY BOARD OF SUPERVISORS et al., Defendants and
Appellants.

## Counsel

Gordon, Defraga, Watrous & Pezzaglia, Titchell, Maltzman, Mark, Bass, Ohleyer & Mishel, Bruen & Gordon and Scott W. Gordon for Plaintiff and Appellant.

Ronald A. Zumbrun, Robin L. Rivett and Charles A. Klinge as Amici Curiae on behalf of Plaintiff and Appellant.

Charles O. Lamoree and Thomas H. Gordinier, County Counsel, Vicki Sieber-Benson, Assistant County Counsel, and Daniel P. Selmi for Defendants and Appellants.

Ira Reiner, District Attonrey (Los Angeles), Harry B. Sondheim and Brent Riggs, Deputy District Attorneys, David Nawi, County Counsel (Santa Barbara), Stephen Shane Stark and Timothy McNulty, Deputy County Counsel, Shute, Mihaly & Weinberger, Fran M. Layton, Wendy S. Strimling and Christy H. Taylor as Amici Curiae on behalf of Defendants and Appellants.

## Opinion

**BAXTER, J.**—We granted review to decide whether state laws governing hazardous waste disposal facilities preempt the efforts of Solano County (County) to force removal of wastes unlawfully deposited by a facility operator within the "buffer" or "setback" zone long established by County land use permits. We find no express or implied state-law restriction on the traditional rule that a local government may specifically enforce its valid land use regulations by demanding the elimination of offending conditions. Indeed, the County's order defers to all conceivable state regulatory concerns. The operator's attack upon the order, accepted by the courts below, would permit the company to reap the benefits of the illegal encroachments. We will therefore reverse in part the judgment of the Court of Appeal.

### Facts

IT Corporation (IT) operates a 106-acre "Class I" hazardous waste disposal facility (the Panoche facility) in the rolling hills of the County. The City of Benicia (City) adjoins the Panoche facility downslope to the southwest. The Panoche facility and surrounding land are zoned for agricultural use.

In 1968, the County issued conditional use permit R-418 allowing the parcel then owned by IT's predecessor, Howard Jenkins, to be employed for

the disposal of liquid and solid hazardous wastes. Permit R-418 included a condition that all treatment and storage of hazardous waste must be set back at least 200 feet of the outer perimeter of the permitted property.

Jenkins created a number of surface impoundments—ponds containing liquid waste—on the property. By 1972, several of these impoundments (ponds 12, 13, 13A, 17, and 18), as well as surface solid wastepile 17P, had encroached within 200 feet of Jenkins's property line. Pond 17 came to the attention of the County's planning commission (Commission) as early as 1971 because the pond had intruded beyond Jenkins's property onto neighbors' land. Apparently Jenkins was allowed to cure the pond 17 violation by purchasing additional land to bring this impoundment within a reconfigured 200-foot setback.

In 1973, the County issued a new permit for the site, No. R-708. Permit R-708 related to a specific site map provided by Jenkins and included a 200-foot setback condition (Condition 3.F.) that was substantially identical to the 1968 restriction.[1]

IT acquired the Panoche facility in 1975 and continued to deposit wastes in ponds 12, 13, 13A, 17, and 18, and in surface wastepile 17P. IT also inherited two landfills which encroached beyond the setback line referred to in permit R-708. IT added hazardous waste to these landfills as well. IT itself established the so-called north drum burial site, which intruded into the setback zone.

Since 1975, IT has purchased additional contiguous land west, north, and east of the facility. The effect of these acquisitions is that only pond 13A, the encroaching unit nearest the City, remains less than 200 feet from the outer boundary of property now owned by IT.

In 1981, the Department of Health Services (DHS), acting under state and federal laws, issued an "Interim Status Document" authorizing operation of the facility. In September 1985, the County's director of public works issued a stop order against grading work at the site on grounds that a grading permit was required and had not been obtained. IT appealed the stop order to the County's board of supervisors (Board). In January 1986, as partial settlement of the grading dispute, IT stipulated to formal hearings before the Commission to determine IT's compliance with permit R-708.

During 1986 and 1987, the Commission held numerous hearings and took voluminous evidence. As IT concedes, evidence of noncompliance with

---

[1]Condition 3.F. provides: "No liquid, semi-liquid or solid waste will be placed upon or in the ground, or otherwise treated or disposed at any place on the site within 200 feet of the property lines."

Condition 3.F. was "overwhelming." The record also touched upon the troubled regulatory history of the facility, which included citations by the California Regional Water Quality Control Board (RWQCB) and the United States Environmental Protection Agency (EPA). Testimony and documentary evidence catalogued leakage and migration of hazardous wastes from encroaching storage areas into surrounding soil of the setback zone and, with respect to pond 13A, beyond the borders of IT's property.

On June 25, 1987, the Commission found that IT was out of compliance with several conditions of the permit. Among other things, the Commission determined that "IT is in violation of Condition 3.F. due to the encroachment of portions of Ponds 12, 13, 13A, 17 and 18, as well as portions of waste pile 17P, the old landfill and the north drum burial area on the 200 foot buffer."

The Commission proposed a two-pronged remedy for the violation of Condition 3.F. First, IT must "immediately cease using and close" all encroachments. Second, IT must within 90 days submit to pertinent state and federal regulators its "plans for clean closure, i.e., removal of all wastes [except drum burials] and contaminated soils" from the setback zone; must modify its closure plans as required by the agencies; and must begin closure immediately upon obtaining necessary regulatory approvals.

IT was ordered to consult further with the agencies on the safest plan for closure of the drum burial encroachment, and to submit a closure plan on that basis. If "clean closure" approval was not obtained for any encroachment subject to that requirement, the Commission promised to "reopen the hearings to review appropriate remedies at that time."[2]

IT appealed the "clean closure" order to the Board. The company urged, inter alia, that the proposed remedy of complete restoration was preempted, arbitrary, unreasonable, and estopped by the County's long delay in enforcing Condition 3.F. IT estimated that "clean closure" of the encroachments entailed removal of some 174,000 cubic yards of hazardous material and might cost as much as $40.5 million.

The Board ordered the Commission staff to study alternate remedies. For the most part, these included variations on IT's proposal that the company

---

[2]The "clean closure" portion of the Commission's proposed order provided: "IT must submit, within 90 days, plans for clean closure, i.e. removal of all wastes and contaminated soils, of all waste disposal areas within the [200-foot] buffer [except the encroaching drum burial site] to the County, EPA, DHS, RWQCB, and [the Bay Area Air Quality Management District] as applicable. IT shall make any modifications in those closure plans which may be required by the agencies and shall begin closure immediately upon the granting of all necessary approvals by the agencies and the County." The Commission further declared that "[i]n the event that clean closure is not approved for one or more of the waste [disposal] areas within the 200 foot buffer, the Commission will reopen the hearings to review appropriate remedies at that time. . . ."

close and cleanse *only* the encroachment adjacent to City (i.e., pond 13A) and simply "dedicate" a *new* 200-foot setback conforming to the current boundaries of IT's property.

In March 1988, after considering the staff report and conducting hearings de novo, the Board adopted the Commission's remedial order. IT sought mandamus.

The superior court granted relief. The court ruled that a violation of Condition 3.F. was established by the administrative record. Applying the "substantial evidence" test of review, it also found "unsupported by the record" IT's separate defenses of laches, estoppel, and the statute of limitations.[3] However, the court concluded that because "state law has pre-empted the storage, treatment, and disposal of [hazardous waste,] . . . [t]he Board is without authority to dictate the remedy"—i.e., "clean closure"—for IT's permit violation. On the other hand, the court held, the Board could order IT to submit for appropriate state regulatory approval "one or more plans by which *[IT] proposes* to remedy the non-compliance." (Italics added.)

Both parties appealed. The Court of Appeal affirmed.

Addressing IT's appeal, the court reasoned as follows: No limitations period had run, because IT's violations were "continuing." With respect to IT's equitable defenses, the trial court properly reviewed the Board's findings under the deferential "substantial evidence" standard, rather than the more stringent "independent judgment" standard urged by IT.[4] The "ambiguous" administrative record did not make clear when the County actually knew or should have known of the bulk of the encroachments. Hence, the trial court correctly declined to uphold IT's claims of laches and estoppel.

Addressing the County's appeal, the court reasoned as follows: The setback condition was a valid local land use regulation, and the Board was entitled to enforce it by ordering IT to "cease using" and "close" the encroachments. However, by dictating the *method* of closure of a hazardous waste disposal site, a matter of statewide concern, the Board invaded the state's "comprehensive" regulation of that subject.

---

[3]IT argued that because the pond 17 encroachment had drawn considerable attention in 1971, and because County inspectors had regularly examined the site thereafter, the County was, or should have been, aware of the encroachments long before it commenced enforcement measures.

[4]IT argued, in essence, that "independent judgment" review was required because the long history of dumping beyond the setback line had given the company a "fundamental vested right" which was substantially affected by the Board's decision. (See *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-45 [112 Cal.Rptr. 805, 520 P.2d 29]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144-147 [93 Cal.Rptr. 234, 481 P.2d 242].)

The County alone sought review, urging that the courts below had erroneously resolved the issue of preemption.

DISCUSSION

1. *Implied preemption.*

█ Neither the trial court nor the Court of Appeal discussed IT's claims of *express* preemption because both courts accepted IT's more general contention that the Board's "clean closure" order was *impliedly* preempted by the comprehensive state statutes and regulations governing the treatment, storage, and disposal of hazardous waste. The County and its amici curiae[5] urge first that this conclusion was erroneous. We agree.

"A county may make and enforce within its limits 'all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' (Cal. Const., art. XI, § 7.) . . ." (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 483-484 [204 Cal.Rptr. 897, 683 P.2d 1150] (*Mendocino*).) █ The power of cities and counties to zone land use in accordance with local conditions is well entrenched. (See, e.g., 3 Manaster & Selmi, Cal. Environmental Law and Land Use Practice (1991 rev.) §§ 60.10, 60.11, pp. 60-14, 60-15; 1 Longtin's Cal. Land Use (2d ed. 1987) § 3.02, pp. 234-235; Cal. Zoning Practice (Cont.Ed.Bar 1969) §§ 1.3-1.6, pp. 4-7.) The Legislature has specified certain minimum standards for local zoning regulations (Gov. Code, § 65850 et seq.) but has carefully expressed its intent to retain the maximum degree of local control (see, e.g., *id.*, §§ 65800, 65802).

A zoning ordinance may allow conditional uses, pursuant to permit, for particular parcels within a zone. The reasonable conditions included in such a permit become part of the zoning regulation applicable to the affected parcel. (1 Longtin's, *supra*, § 3.71[1], at pp. 360-362; 3 Manaster & Selmi, *supra*, § 60.71[1], at pp. 60-97, 60-98; see Gov. Code, §§ 65901, 65909.)

When use of a parcel violates applicable zoning rules, the responsible agency may obtain abatement—i.e., removal of the violation and restoration of legal use—even when substantial expense is involved. (See, e.g., *County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683 [234 P.2d 972] [remove

---

[5]Amicus curiae briefs in support of the County have been filed by the City of Benicia "and Joining California Cities," by the District Attorney of Los Angeles County, and jointly by the Counties of Santa Barbara, Alameda, Butte, Contra Costa, Del Norte, Fresno, Glenn, Inyo, Lassen, Madera, Mendocino, Nevada, Orange, San Bernardino, Santa Cruz, Siskiyou, and Yuba. An amicus curiae brief in support of IT has been filed by Pacific Legal Foundation (Pacific).

fixed 48,000-gallon storage tanks]; *People* v. *Gates* (1974) 41 Cal.App.3d 590 [116 Cal.Rptr. 172] [remove auto wrecking business]; *City and County of San Francisco* v. *Padilla* (1972) 23 Cal.App.3d 388 [100 Cal.Rptr. 223] [remove 2 dwelling units]; *People* v. *Watkins* (1959) 175 Cal.App.2d 182 [345 P.2d 960] [remove portion of structure beyond setback line]; *Donovan* v. *City of Santa Monica* (1948) 88 Cal.App.2d 386 [199 P.2d 51] [remove 20 dwelling units; reconvert main structure to single-family residence].) Abatement does not depend on a finding that the zoning violation constitutes a "nuisance per se." (*City of Santa Clara* v. *Paris* (1977) 76 Cal.App.3d 338, 341-342 [142 Cal.Rptr. 818]; *City etc. of San Francisco* v. *Burton* (1962) 201 Cal.App.2d 749, 756-757 [20 Cal.Rptr. 378].)

Permit R-708 expressly authorizes the Commission to hold periodic compliance reviews and to determine "[a]ny action deemed appropriate" to correct noncompliance therein found to exist. Indeed, IT stipulated to such a review as partial settlement of its grading-permit dispute with the County. Thus, it is clear that neither the setback condition in IT's permit, nor the Board's issuance of a remedial order for noncompliance, exceeds the County's general land use control powers.

██ IT argues instead that this particular order is invalid because it invades the sensitive field of hazardous waste management in ways which are closely and exclusively regulated by the state. In particular, IT invokes the state's complex scheme for overseeing the "closure" of hazardous waste disposal sites—a scheme designed to minimize health, safety, and environmental risks when use of a site is discontinued. This scheme, IT argues, places all "closure" procedures and decisions in the hands of an expert state agency, DHS, and thus precludes a local government from dictating the method of "closure."

The trial court and the Court of Appeal agreed with this contention. We conclude it lacks merit. Nothing in state hazardous waste disposal law implies that a city or county is precluded from abating a clear and potentially dangerous violation of its valid land use regulations.

██ "Local [regulation] in conflict with general law is void. Conflicts exist if the [regulation] duplicates [citations], contradicts [citation], or enters an area fully occupied by general law . . . [citations] . . . ." (*Mendocino, supra,* 36 Cal.3d 476, 484-485, quoting *Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 806-808 [100 Cal.Rptr. 609, 494 P.2d 681].)

". . . In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose

and scope of the legislative scheme. There are three tests: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of . . . local [regulation] on the transient citizens of the state outweighs the possible benefit to the [local government].' [Citations.]" (*Mendocino, supra,* 36 Cal.3d at p. 485, quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809]; accord: *Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 423 [261 Cal.Rptr. 384, 777 P.2d 157] (*WOGA*).)

Here, of course, there is no issue of the challenged order's undue effect on "transient citizens." The question is whether state law has so occupied the subject of hazardous waste management as to preclude a local government from enforcing its long-standing restrictions on the locations within a facility at which hazardous waste may be treated or stored.

The Hazardous Waste Control Act (HWCA), adopted in 1972 (Stats. 1972, ch. 1236, § 1, p. 2388 et seq.), is codified as chapter 6.5 of the Health and Safety Code (§ 25100 et seq.). The HWCA directs DHS to adopt standards and regulations governing the "management of hazardous wastes" in order to "protect against hazards to the public health, to domestic livestock, to wildlife, or to the environment." (Health & Saf. Code, § 25150, subd. (a).) Among other things, DHS must issue permits authorizing operation of hazardous waste disposal facilities and must apply applicable regulations and standards through the permit system. (*Id.,* §§ 25150, subd. (b), 25200.)

DHS may grant "interim status" operating authority to a pre-1980 facility such as Panoche, pending final determination of the operator's permit application. (Health & Saf. Code, § 25200.5, subd. (a).) For HWCA purposes, the Panoche facility apparently has always operated under "interim status" authority.

The HWCA further requires DHS to adopt "closure" regulations and standards for hazardous waste disposal facilities. These regulations must specify financial assurances by facility operators to cover postclosure damage claims, as well as the cost of closure and postclosure maintenance. The regulations must also ensure that every such facility "can be closed and maintained [thereafter] for at least 30 years" without health or environmental damage, and that the escape of contamination from a closed site into the soil,

water, and atmosphere will be "[minimized] or [eliminated]." (Health & Saf. Code, § 25245, subd. (a).)

The HWCA provides that when they apply for permits, "or when otherwise requested by [DHS]," facility operators must submit "closure and postclosure plans" for approval by DHS and RWQCB. (Health & Saf. Code, § 25246, subds. (a), (b).) DHS must approve a plan that complies with all pertinent regulations. (*Id.*, § 25247, subds. (a), (b).)

DHS has implemented the required permit system and has developed extensive regulations governing the design, construction, operation, maintenance, monitoring, closure, and postclosure maintenance of hazardous waste facilities. (See Cal. Code Regs., tit. 26 (hereafter Regulations), §§ 22-66260.1 et seq., 22-66264.110 et seq.; former §§ 22-66316 et seq., 22-67102 et seq.)[6] Among these are detailed standards for the "closure" or "partial closure" of hazardous waste disposal sites, and for the contents of closure plans to be submitted by facility operators. (Regs., §§ 22-66260.10, 22-66264.110, 22-66264.111, 22-66264.112; former §§ 22-66027, 22-66152, 22-67210 et seq.)

 IT contends that the HWCA places the initiative for closure plan design on the *facility operator alone*, subject only to state regulatory standards which do not necessarily require complete restoration of a site to its original condition. IT asserts, and no party disputes, that IT has designed and

---

[6]In its original form, the HWCA preceded adoption of the federal Resource Conservation and Recovery Act of 1976 (RCRA) (Pub.L. No. 94-580, 90 Stat. 2795 (1976), 42 U.S.C. § 6901 et seq.), which covers many of the same topics. The RCRA defers to state hazardous waste programs approved by the EPA administrator as meeting RCRA standards, and similarly allowed "interim authorization" of preexisting state programs the EPA administrator deemed "substantially equivalent" to the RCRA program. (42 U.S.C. § 6926(b), (c).) California's Legislature has authorized and instructed the director of DHS to take all steps necessary to establish an approved program "in lieu" of federal RCRA enforcement. (Health & Saf. Code, §§ 25101, subd. (d), 25159.) However, California's program has never won final EPA approval, and the state's partial "interim authorization" expired in 1986, causing reversion of the federal program to federal control. Hence, both state and federal regulations currently apply in this state. (3 Manaster & Selmi, *supra*, § 50.50[2], at pp. 50-41, 50-42.) Under a 1988 agreement, EPA has delegated the bulk of federal enforcement to DHS.

Effective July 1, 1991, DHS repealed its previous regulatory scheme and substituted a new scheme designed to meet RCRA standards for EPA approval of an "in lieu" state program. Portions of the prior state scheme which exceeded RCRA standards were retained and recodified. (See Regs., § 22-66260.1 et seq.; Barclay's Cal. Code Regs., Digest of New Regulations, Register 91, No. 22 (May 31, 1991).) Text citations to "former" sections of the Regulations indicate section numbers in effect before July 1, 1991.

The RCRA expressly disclaims intent "to prohibit any State *or political subdivision thereof* from imposing any requirements . . . more stringent than those imposed by [RCRA] regulations." (42 U.S.C. § 6929, italics added.) Neither IT nor its amicus curiae argues in this court that the Board's order is directly preempted by the RCRA. (But cf. fn. 17, *post*, at p. 101.)

submitted for DHS approval its own HWCA plan to "close in place" the entire Panoche facility, including the encroaching deposits.[7] Hence, IT contends, the Board's order conflicts with the HWCA by *requiring* IT to submit an *additional* plan that *specifies* "clean" closure of the encroachments.

We cannot accept the premise. With specific exceptions discussed below, nothing in the HWCA or its implementing regulations indicates any intent or need to immunize a state-authorized facility from the enforcement of applicable local land use regulations. Indeed, the HWCA expressly suggests otherwise. Health and Safety Code section 25105 provides that "[n]o provision of this chapter [i.e., ch. 6.5,] shall limit the authority of any state *or local* agency in the enforcement or administration of *any provision of law* which it is specifically permitted or required to enforce and administer." (Italics added.)

As we noted in *Mendocino,* use of the word "law" is significant in this context, for "law" includes local ordinances. (See *Mendocino, supra,* 36 Cal.3d at p. 489.) Moreover, the legislative decision to reserve local powers despite adoption of the HWCA was conscious and specific. The words "or local" were added to Health and Safety Code section 25105 (originally § 25172) during the Legislature's consideration of the HWCA.[8] Given the historic role of cities and counties in local land use regulation, we must assume the Legislature meant to allow the "enforcement" of "local" zoning "law[s]," as applied through use permit conditions. (See *Mendocino, supra.*)[9]

Moreover, the HWCA expressly provides for joint state and local authority over the siting and operation of hazardous waste facilities. Among other

---

[7]Our examination of the record on appeal discloses no reference to the IT closure plan. Apparently the plan was submitted after the filing of the Board's order and was not before the Board. IT has not supplied a copy of the plan on this appeal.

[8]The HWCA was enacted by approval of Assembly Bill No. 598, 1972 Regular Session (hereafter A.B. 598). As added to A.B. 598 by the Assembly on June 8, 1972, former section 25172 of the Health and Safety Code would have provided that no "state agency" was precluded by the HWCA from administering or enforcing other "law" under its jurisdiction. A Senate amendment of November 28, 1972, added the words "or local" between "state" and "agency."

[9]In *Mendocino,* this court concluded that nothing in divisions 6 and 7 of the Food and Agricultural Code, which regulate and license the use of "economic poisons," impliedly preempted a county ordinance prohibiting the aerial application of phenoxy herbicides. Among other things, we observed that under the state regulatory scheme (Food & Agr. Code, § 14007), state-issued agricultural pesticide permits were expressly conditioned upon "compliance with the law," which "law" must be construed to include local health ordinances adopted under the police power. (*Mendocino, supra,* 36 Cal.3d at p. 486.) The Legislature promptly thereafter added section 11501.1 to division 6 of the Food and Agricultural Code and also amended Food and Agricultural Code section 14007. The new section provides that divisions 6 and 7 "are of statewide concern and occupy the whole field of regulation regarding . . . economic poisons to the exclusion of all local regulation"; accordingly, "no ordinance or regulation of local government . . . may prohibit or in any way attempt to

things, the HWCA limits local power to reject a new facility in derogation of statewide interests (see Health & Saf. Code, § 25199 et seq.) but also allows delayed effectiveness of a new *state* permit "until the applicant is granted a local land use permit." (*Id.*, § 25199.3, subd. (a).)

As we said in *Mendocino*, "[p]reemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations. Similarly, it should not be found when the statutory scheme recognizes local regulations." (*Mendocino, supra,* 36 Cal.3d at p. 485; *Casmalia Resources, Ltd.* v. *County of Santa Barbara* (1987) 195 Cal.App.3d 827, 837 [240 Cal.Rptr. 903, 67 A.L.R.4th 809] [finding HWCA did not impliedly preempt local monitoring regulations].)[10]

The Legislature has further undermined IT's claim of "implied" preemption by making clear those narrow areas in which it considers local regulation incompatible with the state scheme. In 1981, the Legislature became concerned that hostile local restrictions on existing hazardous waste disposal facilities might accelerate a developing reduction in statewide disposal capacity. By adding article 4.5 to the HWCA (Stats. 1981, ch. 244, § 3, p. 1295), the Legislature expressly barred unilateral efforts by local governments to "prohibit or unreasonably regulate" the treatment or disposal of hazardous wastes at "existing" "Class I" disposal facilities such as Panoche (Health & Saf. Code, § 25149, subd. (a)).[11]

However, the Legislature has specified the limited nature of this statutory intrusion on local land use regulation. Health and Safety Code section 25147 declares that "[e]xcept as expressly provided in Section 25149, it is not the intent of this article to preempt local land use regulation of existing hazardous waste facilities." Health and Safety Code section 25149, subdivision (a), itself states that "nothing in this section authorizes an

regulate any matter relating to the . . . use of economic poisons, and any of these ordinances, *laws*, or regulations are void and of no force or effect." (Italics added.) The amendment to Food and Agricultural Code section 14007 removed the phrase "compliance with the law" and substituted the phrase "compliance with this code [, related] regulations[,] and . . . such other specified conditions as may be required to accomplish the purposes of this chapter." Though the Legislature stated an intent to "overturn the holding" of *Mendocino* and to "reassert" the exclusive state regulation of economic poisons (Stats. 1984, ch. 1386, § 3, pp. 4879-4880), nothing in its declaration of *express* preemption undermines our conclusion that preemption should not be *implied* when state regulation acknowledges local "law."

[10]Pacific suggests that *Mendocino* announced this principle, without authority, as a "trump card" over the more general tests of legislative intent and occupation of the field. "In sum, amicus [curiae] submits that the unique language in *Mendocino* should be explicitly disapproved or just forgotten. . . ." We are not persuaded. An expressed intent to allow local regulation, or an express recognition of local regulation, is convincing evidence that the state legislative scheme was not intended to occupy the field.

[11]An "existing hazardous waste facility," for purposes of article 4.5 of the HWCA, is defined to include one "operating as of May 1, 1981, pursuant to a grant of interim status by [DHS] pursuant to Section 25200.5." (Health & Saf. Code, § 25148, subd. (a)(2).)

operator of [an 'existing'] facility to violate any term or condition of a local land use permit or any other provision of law not in conflict with this section."[12]

Another example of the Legislature's ability to distinguish expressly between preempted and nonpreempted regulation occurs in article 6.5 of the HWCA, adopted in 1979. (See Stats. 1979, ch. 1097, § 3, p. 3964.) Article 6.5 (Health & Saf. Code, §§ 25167.1-25169.3) sets standards and establishes state registration for transporters and haulers of hazardous waste. Health and Safety Code section 25167.3 declares an intent that article 6.5 preempt "all local regulations and all conflicting state regulations concerning the transportation of hazardous waste" and provides that no local agency, including a charter city or county, "shall adopt or enforce any ordinance or regulation . . . inconsistent with [state] regulations."

█ The Legislature has thus demonstrated its readiness to preempt local regulation unequivocally when persuaded of the need to do so. Its preemptive action in specific and expressly limited areas weighs against an inference that preemption by implication was intended elsewhere.

Examination of "the whole purpose and scope of the legislative scheme" (*Mendocino, supra,* 36 Cal.3d at p. 485) leads us to the same conclusion. The Legislature has declared that the HWCA's purpose is to ensure safe handling, treatment, recycling, disposal, and destruction of hazardous waste (Health & Saf. Code, § 25101, subd. (a)), and to develop a state hazardous waste program "in lieu" of the federal RCRA program. (*Id.,* §§ 25101, subd. (d), 25159; see fn. 6, *ante,* at p. 92.) █ Though extensive and detailed, the HWCA purports only to be a "minimum standards" program and implies no general purpose to strip local entities of their traditional power to impose and specifically enforce land use regulations.

IT points to the California Attorney General's 1974 conclusion that in view of the need for "uniform" statewide standards, the HWCA "[preempts] the field of regulating the handling, processing, and disposal of hazardous . . . waste materials." (57 Ops.Cal.Atty.Gen. 159, 164.) For reasons already stated, the opinion fails to persuade us that the HWCA generally precludes enforcement of a local land use condition.

█ In particular, the Attorney General's opinion construes too narrowly the HWCA's express disclaimer of intent to preempt "enforcement . . . of

---

[12]With respect to facilities not yet in existence, article 4.5 of the HWCA prohibits local authorities, once having issued conditional use permits for particular facilities, from amending them later to impose "additional restrictions" on the types of hazardous waste the facilities may accept. (Health & Saf. Code, § 25149.1, subd. (a).) Article 4.5 thus implicitly acknowledges the general right of local authorities to impose such restrictions in local use permits.

any provision of law" by responsible "local agenc[ies]." (Health & Saf. Code, § 25105, formerly *id.*, § 25172.) Contrary to our later *Mendocino* analysis, the opinion assumes that the statutory reference includes only *state* laws administered by local officials. (57 Ops.Cal.Atty.Gen. 159, *supra*, at p. 163.) Moreover, the express but limited preemption clauses later adopted by the Legislature belie the opinion's assumption of broader preemptive intent.

IT next suggests that the Board's order disrupts the state's regulatory process for closure of hazardous waste facilities, bypasses the expertise of state agencies, and may affect statewide policies on hazardous waste transportation and storage capacity. Again, we disagree. As the County has emphasized, the order does not demand that IT remove all hazardous waste deposits in the setback zone regardless of state regulatory and programmatic concerns. Instead, it simply requires IT to submit the option of "clean" closure—i.e., complete removal of contaminants—for approval by all pertinent regulatory agencies, including DHS.

State regulations require a facility operator to submit a "closure plan" which includes, if applicable, a description how the operator would perform both "final closure" of a facility at the end of its active life *and* "partial or final closure" of the facility *during* its active life. (Regs., § 22-66264.112, subd. (b); former § 22-67212, subd. (b)(1); see also former § 22-67212, subd. (a).) Amendments to the plan must be made, submitted, and approved "whenever changes in operating plans . . . affect the closure plan, or there is a change in the expected year of closure. . . ." (Regs., § 22-66264.112, subd. (c)(2)(A), (B); former § 22-67212, subd. (c).) Current regulations require a facility operator to seek approval of an amended closure plan within 60 days after the plan has been affected by an "unexpected event." (Regs., § 22-66264.112, subd. (c)(3).)

The Regulations set minimum standards for closure plan methodology, but they do not prohibit the operator from submitting a more stringent closure plan. Nor do they exclude local regulation as the cause of operational changes or other "unexpected event[s]" requiring amendment of the plan. A fortiori, they do not eliminate the possibility that enforcement of a local land use regulation might force the operator to submit, for state regulatory approval, a "partial closure" plan which exceeds minimum state standards.[13]

In essence, IT contends that the long-continuing deposit of hazardous wastes in and upon land *never permitted for that use* is exempt from effective

---

[13]Moreover, the Regulations themselves appear to embrace "clean closure" as the preferred methodology for surface impoundments (i.e., ponds for liquid and semiliquid wastes) and surface wastepiles, such as those primarily at issue here. Methods short of "clean closure" are

local remedy simply because a state scheme exists for regulation and "closure" of hazardous waste disposal facilities. However, the HWCA suggests no such wholesale intent to intrude upon the enforcement of local zoning and land use regulations. We conclude that the HWCA does not impliedly preempt the Board's cleanup order.

### 2. *Express preemption.*

 IT and Pacific claim the judgments of the trial court and the Court of Appeal are nonetheless correct on the alternative theory that Health and Safety Code section 25149 *expressly* preempts the Board's order. We are not persuaded.

Health and Safety Code section 25149, subdivision (a), provides in pertinent part that "[n]otwithstanding any other provision of law," and with limited exceptions not applicable here, "no city or county . . . or district may enact, issue, enforce, suspend, revoke, or modify any ordinance, regulation, law, license, or permit relating to an existing hazardous waste facility so as to *prohibit or unreasonably regulate* the disposal, treatment, or recovery of resources from hazardous waste . . . at that facility. . . ." (Italics added.)[14] There is no dispute that the Panoche facility, in operation since the late 1960's, is an "existing hazardous waste facility" as described in the statute. (See *id.*, § 25148, subd. (a); Regs., § 22-66260.10; former § 22-66056.)

IT urges that the Board's order for complete cleanup of the buffer zone thus violates Health and Safety Code section 25149 because it constitutes "enforcement" of a "permit" so as to "unreasonably regulate" hazardous waste disposal at the Panoche "facility." Pacific goes farther, suggesting that by banning local efforts to "prohibit" disposal at an existing "facility," section 25149 prevents *any and all* attempts by the County to limit IT's disposal of hazardous waste within the buffer zone. Neither position has merit.

---

acceptable only where the operator shows alternative means will meet applicable health and environmental standards under the particular circumstances, or that "clean closure" is impracticable. (See Regs., §§ 22-66264.228, 22-66264.258; former §§ 22-67316, 22-67351.)

[14]Under section 25149, subdivision (a), a local government may "prohibit or unreasonably regulate" hazardous waste disposal at an "existing . . . facility" only if, "after public notice and hearing, the director [of DHS] determines that the operation of the facility may present an imminent and substantial endangerment to health and the environment. . . ." The County applied for such a finding in this case, but one had not been made at the time of trial. Article 4.5 also specifically preserves "the right of any person to maintain a civil action to enjoin or abate a nuisance . . . ." (See Health & Saf. Code, § 25149.7; Code Civ. Proc., § 731.) It allows general law cities and counties to impose, for revenue purposes, a maximum 10 percent gross receipts tax on existing facilities. (See Health & Saf. Code, §§ 25149, subd. (a), 25149.5.) Finally, it authorizes a city or district attorney's office, when requested by DHS, to seek injunctive relief against threatened violations of the HWCA within that office's territorial jurisdiction. (See *id.*, §§ 25149, subd. (a), 25181.)

These arguments turn on the meaning of the statutory phrase "prohibit or unreasonably regulate . . . disposal . . . at [a] facility." ▉ To determine legislative intent, we first consult the statutory words themselves, applying their "usual, ordinary import" in harmony with the overall legislative scheme. (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 43 [127 Cal.Rptr. 122, 544 P.2d 1322]; see *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) If the statutory language is ambiguous, we examine the legislative history and other extrinsic indicia of the Legislature's purpose. (See *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587-588 [128 Cal.Rptr. 427, 546 P.2d 1371]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 231-232 [110 Cal.Rptr. 144, 514 P.2d 1224].)

▉ The literal words of Health & Safety Code section 25149 do not solve the precise issue before us—i.e., whether the County may require IT to restore the boundaries within which hazardous waste disposal is a permitted use. The phrase "prohibit . . . the disposal [of] hazardous waste . . . at [a] facility" reasonably suggests more than one meaning, and the phrase "unreasonably regulate" is inherently open to interpretation. We therefore turn to a broader examination of legislative intent.

Health and Safety Code section 25149 falls within article 4.5 of the HWCA. The purpose of article 4.5 is apparent from its legislative findings and declarations. The Legislature determined that statewide disposal capacity, both developed and potential, was decreasing despite increasing demand (Health & Saf. Code, §§ 25146, 25146.5, subd. (b)), and that retention of "the number of existing hazardous waste facilities . . . to the extent feasible" was thus "a matter of urgent public necessity and statewide concern" (*id.*, § 25146.5, subd. (a)).[15]

However, article 4.5 of the HWCA makes clear that it preempts local land use restrictions on existing facilities to the minimum extent consistent with these concerns. As previously noted, the article specifies that it does not preclude "local land use regulation" of existing facilities "[e]xcept as expressly provided in Section 25149" (Health & Saf. Code, § 25147) and does not authorize violation of "any term or condition of a local land use permit . . . not in conflict with [section 25149]" (*id.*, § 25149, subd. (a)).

The express reservations of local authority set forth in Health and Safety Code sections 25147 and 25149 represent a reversal of the original intent of

---

[15]Among the Legislature's detailed findings were that under current law and circumstances, "imbalance between supply and demand is likely to further increase in the foreseeable future"; that the problem is common to urban, suburban, and rural areas throughout the state; and that decreases in capacity increase the distance hazardous waste must be transported for proper disposal, which in turn encourages illegal disposal. (Health & Saf. Code, §§ 25146, 25146.5, subds. (c), (d).)

the bill. As first proposed, these sections would have preempted "all" local regulation of the operation of "existing hazardous waste facilities"; invested state agencies "exclusively" with regulatory authority over such facilities; and, with limited exceptions, prohibited local governments from imposing or enforcing "any" regulation on the treatment, storage, or disposal of hazardous waste therein. (See Sen. Bill No. 501 (1981-1982 Reg. Sess.) (hereafter S.B. 501) § 2.) The current language was later substituted by the Senate. (Sen. Amend. to S.B. 501, Apr. 30, 1981.) The obvious purpose of this successful amendment was to repudiate the notion of complete preemption, and to restrict the traditional land use prerogatives of local agencies only as necessary to serve specific statewide concerns.

Hazardous waste disposal facilities are unpopular neighbors, and the Legislature obviously sought to prevent local political pressure from crippling the functions of a state-authorized facility already operating or under construction. No such concerns are implicated here. Since the inception of the Panoche facility, which long antedates article 4.5 of the HWCA, hazardous waste disposal has been a forbidden use of the 200-foot setback zone. That zone cannot be considered part of the state's "existing" hazardous waste disposal capacity which the Legislature sought to "retain" by enacting article 4.5. By the same token, the Board's cleanup order has no effect on IT's authority to operate within the traditional geographical boundaries of its use permit. Nor does the order eliminate the Panoche facility from the "number of existing hazardous waste . . . facilities." (Health & Saf. Code, § 25146.5, subd. (a).)

Pacific argues that the statutory ban on local regulations which "prohibit . . . disposal" at an existing "facility" protects such a "facility" from *both complete and partial* local "prohibit[ions]." Thus, Pacific concludes, to the extent permit R-708 bans disposal at *any location* within the Panoche facility, Health and Safety Code section 25149 renders such condition void and unenforceable.

However, pertinent statutory and regulatory references suggest that a "facility" is an entire treatment or disposal operation, considered as a whole. (See, e.g., Health & Saf. Code, §§ 25146, 25146.5, 25148; see also Regs., § 22-66260.10; former § 22-66096 ["Hazardous waste facility" means "all" contiguous land and improvements used for management of hazardous waste; "facility" may consist of "one or more . . . units or combinations of . . . units"].) Moreover, the declared objectives of article 4.5 of the HWCA, and the equally explicit limits on its preemptive intent, undermine Pacific's expansive interpretation of the statute. ■ We agree with the County that while Health and Safety Code section 25149 may forbid a local government

from barring an "existing . . . facility's" *acceptance* of hazardous waste pursuant to its HWCA authority, the statute does not prevent the enforcement of original geographical restrictions on *placement* of the waste received.

 IT suggests that the Board's order is not "land use regulation," as to which Health and Safety Code sections 25147 and 25149 state an expressly limited preemptive intent. Instead, IT claims, the order is "hazardous waste closure regulation," a field occupied exclusively by the HWCA. However, by providing that local "land use regulation" and "land use permit [conditions]" are preempted only as expressly provided (see Health & Saf. Code, §§ 25147, 25149, subd. (a)), article 4.5 of the HWCA assumes that hazardous waste operations may be affected by local land use permits and regulations. Moreover, as we have already concluded, the HWCA "closure" provisions imply no preemption of the order at issue here.

IT offers numerous reasons why the Board's order is "unreasonable" regulation expressly preempted by Health and Safety Code section 25149. Because "clean closure" of the setback encroachments conflicts with IT's own submitted plan for "closure in place" of the entire Panoche facility, IT suggests, the order improperly thwarts paramount state regulatory concerns without identifying any "articulated standard" or "competent evidence" in support of its decision. (Citing *Ogden Environmental Services* v. *City of San Diego* (S.D.Cal. 1988) 687 F.Supp. 1436, 1447 (*Ogden*).) IT also implies the Board ignored prohibitive cost estimates for complete restoration of the encroached areas. These contentions are meritless.

IT concedes it has violated the explicit setback condition of its land use permit and wisely makes no claim that the condition itself is "unreasonable."[16] Yet IT suggests that given state regulatory interests under the HWCA, Health and Safety Code section 25149 requires the Board to justify its chosen method of enforcement as against less complete alternatives advanced by IT itself.

---

[16]Such setbacks, of course, are designed to provide a barrier against the migration of contaminants to adjacent waters and lands zoned for incompatible uses. Because of the obvious health, safety, and environmental dangers, state legislation now presumptively requires a *2,000*-foot buffer zone around facilities which began operation after August 6, 1980. (Health & Saf. Code, § 25202.5, subds. (c)-(e).)

The notion that remedies stricter than those proposed by the violator are presumptively "unreasonable" is novel. Such a rule would reward the violation and is compelled neither by Health and Safety Code section 25149 nor by the HWCA in general.[17]

In any event, the basis of the Board's decision is both manifest and reasonable. ▬ ██ ██ Unless the encroaching deposits are removed, IT's mere violation of the setback condition will have defeated the specific and legitimate purpose of the condition—maintenance of a waste-free "buffer" around the original permitted disposal site.[18]

The Board considered IT's proposed alternatives, which involved dedication of a *new* setback line, consistent with the *current* boundaries of IT's property, so as to enclose all but one of the current encroachments. But these proposals really constituted no enforcement or remedy at all. Rather, they rewarded and ratified IT's violations by simply expanding the permit boundaries to accommodate them. The Board's insistence upon the original terms of the permit was hardly "unreasonable."[19]

IT notes that the staff report studied by the Board identified considerable technical problems and environmental risks of moving and redepositing the encroaching wastes. In light of these difficulties, IT suggests, the only

[17]*Ogden, supra*, 687 F.Supp. 1436, on which IT heavily relies, is inapposite. There, after extensive study, state and federal agencies issued permits for operation of an experimental treatment facility in a municipal area already zoned for that use. The city responded by hastily adopting a use permit ordinance, then delayed and ultimately denied a permit on vague grounds. *Ogden* concluded that such local obstructionism was preempted as "a significant obstacle to the fulfillment of a clear congressional objective" set forth in the RCRA. (*Id.*, at p. 1450; see *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 586-587, 61 S.Ct. 399].) The court suggested that the RCRA's "savings clause" for "more stringent" local regulation (42 U.S.C. § 6929) applies only when the local government proceeds upon "adequate information and study" and by "articulating specific health or safety concerns or setting forth particular environmental requirements which the facility must meet . . . ." (*Ogden, supra*, 687 F.Supp. at pp. 1448, 1450.) Here, however, the County's "clean closure" order is no standardless subversion of state policy; it merely remedies the violation of a condition under which IT has always been required to operate.

[18]Thus we may reject IT's argument, not raised in the trial court, that the Board's order is void as a matter of administrative law because it lacks "findings to bridge the analytic gap between the raw evidence and [the] ultimate decision . . . ." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) There is no such "analytic gap." The order flows implicitly from the Board's undisputed "finding," on undisputed "evidence," that the requirement of a 200-foot waste-free buffer around the permitted disposal site had been violated in specific respects.

[19]The current basic zoning of the area is for agriculture, a use incompatible with hazardous waste contamination. Moreover, the Panoche facility abuts the City of Benicia, and logic suggests that the land acquired by IT since issuance of the permit has potential for residential or commercial development. The Board was not obliged to eliminate or restrict these possible uses simply to accommodate IT's violation of its permit.

"reasonable" decision was to leave the competing interests for resolution between IT and DHS under the "closure" provisions of the HWCA.

In effect, however, this is what the Board has done. Under its order, pertinent regulatory agencies are free to conclude that the risks and burdens of "clean closure" are unacceptable.[20] IT's claim that paramount state law leaves IT free to choose its preferred remedy has already been rejected.

We conclude that the Board's order does not constitute "unreasonable" or "prohibitory" regulation of an "existing hazardous waste facility." Hence, the order is not expressly preempted by article 4.5 of the HWCA.[21]

## CONCLUSION

The judgment of the Court of Appeal is reversed insofar as it holds that the Board's order for "clean closure" of the setback encroachments is preempted by state laws governing hazardous waste disposal facilities. In all other respects, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Arabian, J., and George, J., concurred.

---

[20]IT notes that closure of a hazardous waste facility is a "discretionary project" under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and thus requires consideration of an environmental impact report (EIR) before final closure decisions are made. Nothing in the Board's order precludes DHS from including evaluation of an EIR in its decision whether to approve "clean closure" of the setback encroachments.

[21]The Regulations effective July 1, 1991 (see fn. 6, *ante*), include new section 22-66260.4, which provides that "[n]o local agency shall enforce any requirement, other than those in this division, which would impede interstate or intrastate transportation or disposal of hazardous waste or which would impede use of facilities for regional multi-county management of hazardous waste." The meaning of the phrase "impede . . . disposal of hazardous waste" is not clear on its face, but a county's efforts to obtain removal of stored waste from land where such storage was never permitted cannot reasonably be deemed an "imped[iment]" to disposal within the regulatory meaning. In any event, section 22-66260.4 of the Regulations does not derive from any specific provision of the HWCA, and application of this Regulation against the County's enforcement of its long-standing land use limitation would appear to contravene Health and Safety Code sections 25105, 25147, and 25149.