[No. A092831. First Dist., Div. Four. Aug. 14, 2001.]

PLEASANT HILL BAYSHORE DISPOSAL, INC., Plaintiff and
Respondent, v.
CHIP-IT RECYCLING, INC., et al., Defendants and Appellants.

## COUNSEL

Steefel, Levitt & Weiss, Barry W. Lee and Jojiro Takano for Defendants and Appellants.

Henn, Etzel & Moore and John Douglas Moore for Association of California Recycling Industries, Californians Against Waste, California Resource Recovery Association, Grass Roots Recycling Network, Independent Recyclers Council and the Northern California Recycling Association as Amici Curiae on behalf of Defendants and Appellants.

Bruen & Gordon, Thomas M. Bruen, Scott W. Gordon and John A. Burke for Plaintiff and Respondent.

Burke, Williams & Sorensen, John J. Welsh and Rufus C. Young, Jr., for City of Alhambra, City of Antioch, City of Camarillo, City of Irwindale, City of Lakewood, City of Palm Springs, City of San Jose, City of Signal Hill, City of Sunnyvale and City of Vacaville as Amici Curiae on behalf of Plaintiff and Respondent.

Astor & Phillips, John Kelly Astor, Ronald N. Sarian and George R. Phillips, Jr., for California Refuse Removal Council as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KAY, J.**—The central issue on this timely and authorized appeal from an order granting a preliminary injunction (Code Civ. Proc., § 904.1, subd. (a)(6)) is whether the enactment by Congress of an obscure law concerning the Federal Aviation Administration in 1994 preempted long-established local authority over garbage, specifically the power to grant an exclusive franchise for the collection and disposal of refuse. We conclude that Congress had no intent to occupy this field to the complete exclusion of local regulation. Finding no defect with the order, we shall affirm it.

BACKGROUND

The injunction restrains defendants Chip-It Recycling, Inc., and its president Bruce McChesney (hereafter collectively referred to as Chip-It), from "soliciting and/or entering into contracts with individuals or entities for the collection and/or disposal of any Solid Waste" within the boundaries of the City of Antioch and the Central Contra Costa Solid Waste Authority (CCCSWA). Chip-It was also restrained from "collecting and/or disposing of any Solid Waste anywhere within the boundaries of the CCCSWA," but Chip-It was not prohibited "from collecting recyclable materials within the CCCSWA which have been separated from garbage and refuse by the waste generator at the point of collection. Within the CCCSWA, recyclable construction and demolition debris shall be considered to have been separated from garbage and refuse by the waste generator at the point of collection where the average percent of non-recyclable residual placed for collection is no more than 20%, and 80% or more of material placed for collection is actually recycled and beneficially reused." The injunction defines "solid waste" by adopting the definition of the California Integrated Waste Management Act of 1989—"all putrescible and nonputrescible solid, semisolid, and liquid wastes, including garbage, trash, refuse, paper, rubbish, ashes, industrial wastes, demolition and construction wastes, abandoned vehicles and parts thereof, discarded home and industrial appliances, dewatered, treated, or chemically fixed sewage sludge which is not hazardous waste, manure, vegetable or animal solid and semisolid wastes, and other discarded solid and semisolid wastes." (Pub. Resources Code, § 40191, subd. (a).)

The salient circumstances are easily set forth. Plaintiff Pleasant Hill Bayshore Disposal, Inc. (hereinafter Pleasant Hill), has an exclusive franchise for the collection, removal, transfer, transportation, and disposal of "solid waste" within CCCSWA. Pleasant Hill also has an exclusive franchise for the collection, removal and disposal of "all garbage, rubbish and recyclable/salvageable materials" within the City of Antioch. Chip-It describes its business as the collection and removal of "recyclable construction and demolition debris materials such as wood, metal, sheet rock, stucco, concrete, and cardboard from construction sites and other commercial sites where this material is generated." Chip-It "hauls both source-separated (segregated by the customer) and mixed loads of recyclable materials from its customer[s]," who pay a fee for Chip-It to collect and transport the materials in "debris boxes." Chip-It charges a "hauling fee" for these services. The size of the fee depends "on the type and quantity of the recyclable material." Chip-It transports the materials to recycle processors. "Through these processors, the recyclable wood is made into fuel, pallets,

and particle board; the concrete and stucco become Class II road base or are used in levee repair; the metal is baled and sold for commercial reuse; sheet rock is remanufactured into new sheet rock; and the cardboard is processed for commercial reuse. After sorting and processing, only a small amount (well below twenty percent by weight) of non-recyclable material remains for disposal in landfill."

Claiming that Chip-It's conduct violated its exclusive franchises, Pleasant Hill filed a complaint for damages and injunctive relief. One week later Pleasant Hill applied for a temporary restraining order and a preliminary injunction. The parties submitted more than a dozen declarations, deposition excerpts, and a wealth of supporting documentation. Chip-It argued that its "recycling activity squarely falls within the preemptive scope" of a federal law which displaced "State and Local Regulation of Transportation Of Recyclable Material" and thus trumped Pleasant Hill's exclusive franchises. Chip-It further argued that Pleasant Hill had not established that what Chip-It was doing violated either of the franchises. Finally, Chip-It argued that injunctive relief should be denied because (1) Pleasant Hill could be compensated with monetary damages; and (2) the balance of equities between Pleasant Hill—"which has an army of employees and equipment and is itself a wholly owned subsidiary of an even larger corporation"—and Chip-It—"a small business with nine employees and four trucks"—favored Chip-It and its customers.

With the assistance of an attorney knowledgeable about the subject who acted as a special master, the trial court entered the injunction quoted above.

REVIEW

I

The major contention Chip-It presents against the injunction is that it contravenes a federal law that Chip-It claims preempts state authority, the basis for the exclusive franchises held by Pleasant Hill. The statute in question is the Federal Aviation Administration Authorization Act of 1994 (hereafter cited as the FAA Authorization Act) (Pub.L. No. 103-305 (Aug. 23, 1994) 108 Stat. 1569). Chip-It sees preemption in section 601, the sole measure in title VI (Intrastate Transportation of Property) of this enactment. Although the section is too lengthy to quote in full, its structure suggests its limited scope.

Subdivision (a) of section 601 of the FAA Authorization Act is Congress's finding that "(1) the regulation of intrastate transportation of property by the States has— [¶] (A) imposed an unreasonable burden on interstate commerce; [¶] (B) impeded the free flow of trade, traffic, and transportation

of interstate commerce; and [¶] (C) placed an unreasonable cost on the American consumers; and [¶] (2) certain aspects of the State regulatory process should be preempted." Subdivision (b) concerns preemption of state regulatory authority of "Transportation by Air Carrier or Carrier Affiliated with a Direct Air Carrier." The subject of subdivision (c)(1)—the specific focus of Chip-It's arguments—is "Preemption of State Economic Regulation of Motor Carriers." It provides that (with certain exceptions not relevant here) "a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier . . .) or any motor private carrier with respect to the transportation of property." (FAA Authorization Act, § 601 (c)(1), codified at 49 U.S.C. § 14501(c)(1) (hereafter section 14501(c)(1)).)

As Chip-It views the matter, "Because Congressional intent to preempt local regulation of intrastate transportation of property is clear and un-equivocal from the language of Section 14501, if Chip-It's transportation of recyclable materials is the transportation of property under federal law, then *any state or local regulation* of Chip-It's activities is impermissible." (Italics added, fn. omitted.)

The idea that the FAA Authorization Act preempts state and local regu-latory power in the area of garbage/waste/refuse appears to be several years old (see O'Connell et al., *The Golden Dustman in the Golden State: Exclusive Contracts for Solid Waste Collection and Disposal in California* (2000) 32 Urb. Law. 281, 311-314), but there is a dearth of useful precedent. In 1997 a federal district court in Oregon enjoined enforcement of a county waste disposal ordinance on the ground of preemption by the FAA Authorization Act. Two years later the Ninth Circuit Court of Appeals reversed on the ground that the district court should have abstained from acting while state court proceedings were pending. (*Woodfeathers, Inc. v. Washington County, Or.* (9th Cir. 1999) 180 F.3d 1017.) Last year another district court in Oregon held the same county ordinance preempted. An appeal from this unpublished decision is currently pending in the Ninth Circuit. (*A.G.G. Enterprises, Inc. v. Washington County, Or.* (D.Or., Apr. 6, 2000, No. CIV. 99-1097-KI) 2000 WL 361892 (hereafter *A.G.G.*).) Even though the *A.G.G.* decision involves a federal court construing a federal statute, it is not binding here. (E.g., *People v. Avena* (1996) 13 Cal.4th 394, 431 [53 Cal.Rptr.2d 301, 916 P.2d 1000] and decisions cited.) Nevertheless, because it is pretty much the sole authority on this issue,[1] is extensively discussed in the briefs, and is factually similar to the case at bar, the *A.G.G.* opinion warrants examination in detail.

---

[1]Unmentioned by Chip-It in its opening brief is a decision by the Washington Court of Appeals holding that the FAA Authorization Act does not preempt state regulations concern-

The plaintiff in *A.G.G.,* like Chip-It, hauled and sorted loads of debris from construction sites for recycling. Like Chip-It, it was paid to remove the material. The plaintiff applied for a license to operate in Washington County; no action on the application was taken due to the local practice of granting what in practical effect was an exclusive franchise within a geographical area. (*A.G.G., supra,* 2000 WL 361892 at pp. *1-2.) The district court agreed with the plaintiff that the FAA Authorization Act preempted the licensing requirements and issued a permanent injunction. Analyzing decisions from the Interstate Commerce Commission (ICC), the *A.G.G.* court concluded that mixed solid waste hauled by the plaintiff constituted "property" because it possessed "economic value inherent in the material" even though it had been discarded. The court also concluded that the waste was property according to a more recent decision by the Interstate Commerce Commission which adopted a broader definition: " 'Property' connotes ownership as well as value. Something that is owned can be 'property' notwithstanding its lack of economic value." (*Id.* at pp. *6-8, quoting *Nuclear Diagnostic Laboratories, Inc.* (1979) 131 M.C.C. 578, 580.)

While the pending appeal of the *A.G.G.* federal district court decision makes it impossible to predict whether its reasoning will be adopted by other courts, it will not be adopted by this one.[2] We are unable to agree with the *A.G.G.* conclusion that section 14501(c)(1) preempts state and local regulatory authority over waste collection, recycling, and disposal. ■ The framework for preemption is well established: "The pre-emption doctrine, which has its roots in the Supremacy Clause, U.S. Const., Art. VI, cl. 2, requires us to examine congressional intent. Pre-emption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.' [Citation.] Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be inferred because '[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' because

---

ing garbage. (*Wa. Util. & Transp. Com'n. v. Haugen* (1999) 94 Wash.App. 552 [972 P.2d 1280].) Although this decision reaches the same conclusion as do we, its analysis of the issue is too brief to be of much assistance.

[2]A.G.G. thereafter began collecting solid waste in smaller containers, which provoked a new lawsuit. After noting that "defendants have litigated the issue more forcefully [than in the earlier proceeding] and have provided additional case law which was instructive," the same federal court found that local regulation of this activity was not preempted by the FAA Authorization Act. (*A.G.G. Enterprises, Inc. v. Washington County* (D.Or. 2001) 145 F.Supp.2d 1215, 1224.) Whether or not this opinion is a sub silento repudiation of the earlier decision now on appeal to the Ninth Circuit has attracted the natural attention of the parties, but it is not a question we are required to answer. All that is pertinent here is the initial decision and our disagreement with it.

'the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because 'the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.' [Citation.]." (*Fidelity Federal Sav. & Loan Assn. v. De La Cuesta* (1982) 458 U.S. 141, 152-153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664].) Analysis is also made of contextual factors such as history, entrenched practice, congressional purpose, and the entirety of the regulatory scheme. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 484-486 [116 S.Ct. 2240, 2250-2251, 135 L.Ed.2d 700].) The analysis commences with the presumption that preemption was not intended, particularly with respect to traditional areas of state and local competence. (*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645, 654-655 [115 S.Ct. 1671, 1676, 131 L.Ed.2d 695].)

 Section 14501(c)(1) is obviously and expressly intended as a preemption measure, but the scope of Congress's goal is not entirely clear from the statutory language alone. The Ninth Circuit has stated: "The only pre-enactment legislative history . . . addressing the meaning of 'property' states that section [14501(c)] 'does not preempt State regulation of garbage and refuse collectors' because 'under ICC case law, garbage and refuse are not considered property.' *See* H.R. Conf. Rep. No. 103-677 at 85 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1754, 1757."[3] (*Woodfeathers, Inc. v. Washington County, Or.*, supra, 180 F.3d 1017, 1022.) The court there concluded only that federal preemption of local garbage and refuse-related ordinances "is not so 'readily apparent.' " (*Ibid.*) We believe a more definitive answer may be hazarded after a consideration of other factors.

The first place to look is at other provisions of the FAA Authorization Act. The other titles of the act are Airport and Airway Improvement, Other Aviation Programs, Research, Engineering, and Development of aviation-related projects, Extension of Airport and Airway Trust Fund Expenditure Authority, and Miscellaneous Provisions relating to various aviation subjects. (108 Stat. 1569-1570.) The clear impression is that this is, as its name states, a congressional measure devoted to aviation. This is hardly a subject with a natural connection to trash collection. This impression is confirmed by consulting what the Ninth Circuit termed "[t]he only pre-enactment legislative history." (*Woodfeathers, Inc. v. Washington County, Or.*, supra, 180 F.3d 1017, 1022.) With respect to section 601 of the bill, which was

---

[3]We granted Chip-It's request to take judicial notice of the congressional report cited. At the same time we declined to take judicial notice of various statements made by members of Congress and the President following enactment of the FAA Authorization Act.

codified as section 14501(c)(1), the House Conference Report has some highly pertinent remarks.[4] Concerning what became section 14501(c), the report states: "The provision preempts State regulation of prices, routes and services by air carriers and carriers affiliated with a direct air carrier through common controlling ownership . . . . The purpose of this demarkation [*sic*] is (1) to as completely as possible level the playing field between air carriers on the one hand and motor carriers on the other with respect to intrastate economic trucking regulation, and (2) to recognize that air carrier express package delivery companies may differ in corporate form, but operate in the same manner." (H.R. Rep. No. 103-677, 2d Sess. (1994), reprinted in 1994 U.S. Code Cong. & Admin. News, p. 1754 (hereafter the 1994 Conference Report).)

"The central purpose of this legislation is to extend to all affected carriers, air carriers and carriers affiliated with direct air carriers through common controlling ownership on the one hand and motor carriers on the other, the identical intrastate preemption of prices, routes and services as that originally contained in . . . the Federal Aviation Act." (1994 Conf. Rep., *supra*, 1994 U.S. Code Cong. & Admin. News, p. 1755.)

"The conferees further clarify that the motor carrier preemption provision does not preempt State regulation of garbage and refuse collectors. The managers have been informed by the Department of Transportation that under ICC case law, garbage and refuse are not considered 'property.' Thus garbage collectors are not considered 'motor carriers of property' and are thus unaffected by this provision." (1994 Conf. Rep., *supra*, 1994 U.S. Code Cong. & Admin. News, p. 1757.)

In light of this background as to Congress's legislative intent, Chip-It's interpretation of the preemptive effect of section 14501(c)(1) is untenable. There is an undeniable measure of preemption intended by Congress, but there is no indication that it was meant to extend to immunize Chip-It from local regulation. No such immunity is discernible from " 'the statute's language or . . . its structure and purpose.' " (*Fidelity Federal Sav. & Loan Assn. v. De La Cuesta, supra*, 458 U.S. 141, 153 [102 S.Ct. 3014, 3022].) As fairly indicated by its title, Congress intended the FAA Authorization Act to govern aviation carriers and certain types of motor vehicle carriers that are

---

[4] According to the leading treatise, "[s]ince the conference report represents the final statement of terms agreed to by both houses of Congress, next to the statute itself, it is the most persuasive evidence of congressional intent." (2A Sutherland on Statutory Construction (6th ed. 2000 rev.) § 48:08, pp. 448-449.)

affiliated with aviation carriers. On its face, the FAA Authorization Act is not, as Pleasant Hill points out, "an environmental statute." Garbage collection, as recognized by the legislative history quoted, was clearly deemed to be an unrelated concern. There is no mention of local recycling programs in the legislative history, still less any indication that Congress intended to displace them. (See 1994 Conf. Rep., *supra*, 1994 U.S. Code Cong. & Admin. News, pp. 1754-1761.) The FAA Authorization Act does not establish or contribute to a " 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' " (*Fidelity Federal Sav. & Loan Assn., supra*, 458 U.S. at p. 153 [102 S.Ct. at p. 3022].) To the contrary, other parts of the same statute explicitly preserve local regulatory authority over specified areas "with respect to motor vehicles" (§ 14501(c)(2) & (3)).

Finally, the subject of garbage and trash collection is not " 'a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject' " (*Fidelity Federal Sav. & Loan Assn. v. De La Cuesta, supra*, 458 U.S. 141, 153 [102 S.Ct. 3014, 3022]). Several years ago this court undertook an exhaustive examination of the California Integrated Waste Management Act of 1989 (Waste Management Act). Noting that the subjects of refuse and exclusive refuse franchises have long been treated as traditional subjects within local police powers, and that "the Waste Management Act looks to a partnership between the state and local governments, with the latter retaining a substantial measure of regulatory independence and authority," we held that this comprehensive scheme did not preempt the well-established power of local governments to grant an exclusive franchise for the collection of refuse. (*Waste Resource Technologies v. Department of Public Health* (1994) 23 Cal.App.4th 299, 304-307 [28 Cal.Rptr.2d 422] and authorities cited.) We explained how this comprehensive scheme did not impose a regulatory straightjacket: "It is self-evident that the way in which Los Angeles deals with refuse may be entirely different from the approach of a small rural town. Provisions of the Waste Management Act demonstrate that the Legislature took account of this reality. It knew that factors such as geography and population density might require a different approach [citations]. Local conditions transcending city or county boundaries might require collection and disposal to be handled on a regional basis, and the Legislature encouraged such efforts [citations]." (*Waste Resource Technologies v. Department of Public Health, supra*, 23 Cal.App.4th 299, 307.) After quoting Public

Resources Code section 40059,[5] we stated that "A number of conclusions . . . can be extracted from this statute. First, the Legislature recognized that not every aspect of the solid waste problem could be handled in the Waste Management Act; the infinite details of actual day-to-day operations could not be resolved in Sacramento. Second, the Legislature further recognized that those details should more appropriately be specified by local authorities with greater knowledge of local conditions. Third, the Legislature made express provision for this element of local regulation. . . . The gist of these conclusions is the Legislature's considered opinion that there was no need for statewide uniformity which outweighed the advantages of local governments retaining the power to handle problems peculiar to their communities. [¶] We do not believe that the Waste Management Act represents a fundamental change in the Legislature's traditional outlook towards the subject of waste handling. Section 40059—as well as the entire scope of the Act— establishes the Legislature's awareness that ' "substantial[] geographic, economic, ecological or other distinctions are persuasive of the need for local control' " and thus precludes the subject from being " 'comprehensively dealt with at the state level.' " [Citation.] Beyond question, the Act not only anticipates and tolerates, but as a practical matter demands, supplementary local regulation to spell out the details of solid waste collection and disposal. This is 'convincing evidence that the state legislative scheme was not intended to occupy the field.' [Citation.] These factors demonstrate that there is no exclusive or even paramount state concern which requires disabling traditional local power in this area." (*Waste Resource Technologies, supra,* at pp. 308-309.)[6]

This analysis is even more forceful when considered against the consequence of Chip-It's argument—the abrogation by section 14501(c)(1) of every vestige of local governmental power over refuse collection. ▪ Authority over refuse has been treated as part of the police power that covers the plenum of authority to legislate for the general welfare of society. The police power is so important that it is deemed an inherent attribute of political sovereignty. (E.g., *Munn v. Illinois* (1876) 94 U.S. 113, 125 [24

---

[5]This statute is the legislative authorization for exclusive refuse collection franchises. Public Resources Code section 40059, subdivision (a)(1), which is more germane to the point here, provides: "Notwithstanding any other provision of law, each county, city, district, or other local governmental agency may determine all of the following: [¶] (1) Aspects of solid waste handling which are of local concern, including, but not limited to, frequency of collection, means of collection and transportation, level of services, charges and fees, and nature, location, and extent of providing solid waste handling services."

[6]We reiterated these conclusions when we upheld the voters' power to repeal by initiative an exclusive franchise granted by a municipality. (*Empire Waste Management v. Town of Windsor* (1998) 67 Cal.App.4th 714 [79 Cal.Rptr.2d 262].)

L.Ed. 77]; *In re Rameriz* (1924) 193 Cal. 633, 649-650 [226 P. 914, 34 A.L.R. 51]; *People v. K. Sakai Co.* (1976) 56 Cal.App.3d 531, 535; 6A McQuillin, Municipal Corporations (3d ed. 1997) §§ 24.01-24.02, pp. 7-12; see also 7 McQuillin, Municipal Corporations, *supra*, §§ 24.242, pp. 117-119, 24.245, pp. 127-129; cf. *Matula v. Superior Court* (1956) 146 Cal.App.2d 93, 104 [303 P.2d 871] ["It is a duty of government to either collect the garbage . . . or cause it to be collected"].) Local authority over refuse is sufficiently entrenched that there can be no presumption that Congress intended to disturb "the historic primacy of state regulation of matters of health and safety." (*Medtronic, Inc. v. Lohr*, *supra*, 518 U.S. 470, 485 [116 S.Ct. 2240, 2250]; accord, *Buckman Co. v. Plaintiffs' Legal Committee* (2001) 531 U.S. 341, 348 [121 S.Ct. 1012, 1017, 148 L.Ed.2d 854]; *Hillsborough County v. Automated Medical Labs., Inc.* (1985) 471 U.S. 707, 715 [105 S.Ct. 2371, 2376, 85 L.Ed.2d 714]; *Jones v. Rath Packing Co.* (1977) 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604].)

The logic of Chip-It's argument is that Congress would have the sole and exclusive power to legislate on every aspect of the collection and disposal of refuse from Pawtucket to Pelican Bay if it can be seen as "property" transported by a "motor carrier." It would be striking for such a massive shift of power and authority to be accomplished by a fragment of a subdivision in an act devoted to a subject that has no obvious relation to that of refuse and does not even employ that term. It verges on the inconceivable that Congress had such an intent.[7] There is nothing in the language or legislative history of section 14501(c)(1) giving the least credence to Chip-It's claim that Congress intended to make itself the sole authority in a field where local authority has been traditionally accepted as preeminent.

Citing 42 United States Code section 4331(b)(6), a provision of the Environmental Protection Act (EPA), Chip-It points to "the federal government's long-standing and unequivocal support for the development and maximization of recycling activities." That recycling is indeed a goal the national government has chosen to promote is not in doubt, but more useful analogues are the Solid Waste Disposal Act, as amended by the Resource Recovery Act of 1970 (Pub.L. No. 89-272 (Oct. 20, 1965) 79 Stat. 997 as amended by Pub.L. No. 91-512 (Oct. 26, 1970) 84 Stat. 1227, codified at 42 U.S.C. § 6901 et seq.). Finding that "the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and

---

[7]Just this year the United States Supreme Court stated this principle in unusually vivid language: "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouse-holes." (*Whitman v. American Trucking Associations* (2001) 531 U.S. 457, 468 [121 S.Ct. 903, 909-910, 149 L.Ed.2d 1].)

local agencies" (42 U.S.C. § 6901(a)(4)), Congress established a collaborative effort between local and federal governments to handle the growing problem of solid waste collection and disposal. (See *id.*, §§ 6902(a)(1) [goals to be achieved by federal government "providing technical and financial assistance to State and local governments . . . for the development of solid waste management plans"], 6907(a) [federal guidelines to be issued "in cooperation with appropriate" local governments], 6908(a) [EPA administrator "shall establish a program to assist small communities in planning and financing environmental facilities"], 6913 [EPA administrator directed to furnish "teams of personnel" providing "technical assistance on solid waste management" to local governments], 6931 [financial grants to states].) This collaborative approach is similar to the structure of California's Waste Management Act discussed above. It is particularly germane to note that in the formulation of state or regional solid waste plans, Congress acted to remove obstacles to long-term contracts for processing solid waste. (*Id.*, §§ 6943(a)(5), 6948(d).) Congress also provided for guidelines that would be mandatory for federal agencies but only recommended for the States. (See 40 C.F.R. §§ 240.100(d), 246.100(b) (2000).) It is scarcely creditable that by enacting the FAA Authorization Act Congress would overturn all of this carefully crafted handiwork without a mention.

The crucial point of Chip-It's argument is the premise that the materials it transports constitute "property," a term that is not defined by the FAA Authorization Act. Chip-It is therefore forced to resort to decisions from the ICC.[8] "ICC case law, however, is equivocal. Compare *Joray Trucking Corp. [v. Common Carrier Application]* 99 M.C.C. 109, 110 (1965) (holding that debris from excavation and demolition sites is not property under the Interstate Commerce Act), *with Transportation of 'Waste' Prods. for Reuse and Recycling*, 114 M.C.C. 92, 105 (1971) (distinguishing *Joray* because recyclables, in contrast to the demolition debris, 'have been purchased and will not merely be discarded but, rather, will become vital elements in the manufacturing process in which they are to be utilized') . . . ." (*Woodfeathers, Inc. v. Washington County, Or.*, *supra*, 180 F.3d 1017, 1022.) Based on these decisions, as well as *Nuclear Diagnostic Laboratories, Inc.*, *supra*, 131 M.C.C. 578 (finding radioactive waste constituted "property"),[9] Chip-It expends much effort in demonstrating that the materials it transports qualify as "property" and thus come within the preemptive ambit of section 14501(c)(1) according to the reasoning of *A.G.G.* Chip-It is in effect arguing that considerable material that was formerly deemed refuse has value in this

---

[8] Which was abolished effective January 1, 1996. (Pub.L. No. 104-88 (Dec. 29, 1995) 109 Stat. 803.)

[9] We granted Chip-It's request to take judicial notice of these ICC decisions.

age of recycling and is therefore elevated to the status of "property" within the meaning of section 14501(c)(1). There are a number of reasons this approach is unpersuasive.

First, among the ICC decisions *Joray* is most persuasive because it dealt with "debris" generated from excavations and demolition of buildings. The reasoning was that "the debris, although it may ultimately serve a purpose in helping to fill wasteland, is not purchased from the contractors who desire its removal and to them it has a negative value as a commodity . . . . The contractors are not concerned with any beneficial ownership of the debris, they do not select the destination to which it is to be taken (they may not even know where it will be taken), and it would appear that they relinquish any nominal ownership of the commodity at the time it is loaded and removed from the demolition or excavation site. Thus, we are inclined to conclude that the commodity does not have the attributes commonly associated with the word property." (*Joray Trucking Corp. v. Common Carrier Application, supra*, 99 M.C.C. 109, 110.) *Joray* is directly relevant to Chip-It's business of collecting "construction and demolition debris."

*Joray* is clearly more useful as a precedent than *Nuclear Diagnostic Laboratories*, where the ICC concluded that radioactive waste material transported not for recycling but disposal constituted property. Radioactive material is a unique substance, sui generis, generating safety issues found nowhere else. It is not surprising that it receives specialized treatment accorded to no other type of waste. For example, the interstate "movements" of radioactive waste were described as "extremely few in number," whereas the intrastate transportation of construction debris is undoubtedly more common and frequent. We are therefore especially cautious in analogizing from the ICC's reasoning that "the economic value of hazardous materials . . . should not be the sole criterion for determining whether these commodities are 'property' . . . . 'Property' connotes ownership as well as value. Something that is owned can be 'property' notwithstanding its lack of economic value." (*Nuclear Diagnostic Laboratories, Inc., supra,* 131 M.C.C. 578, 579, 580.) If, as Chip-It maintains, matter does not have to have value in order to constitute property within the meaning and scope of the FAA Authorization Act, it would follow that virtually any tangible matter is property the transportation of which by a motor carrier is thus immune from regulation by any unit of government except Congress.

*Transportation of "Waste" Products for Reuse and Recycling (General Motor Carrier Licensing)* (1971) 114 M.C.C. 92 (*Transportation of "Waste" Products for Reuse*) found the ICC considering a new approach to "streamlining our present motor carrier licensing procedures insofar as they relate to

the for-hire transportation of waste materials for recycling or reuse . . . ." The relevant portion of the decision reads: "The essential question is . . . whether the commodities here to be transported are in fact 'property' for purposes of our jurisdiction. The transportation of trash and garbage, which has no property value, solely for the purpose of disposal is not subject to economic regulation by this Commission. *Joray Trucking Corp. Common Carrier Application,* 99 M.C.C. 109 (1965). On this premise, [dissenting commissioners] contend that the nature of the involved commodities has not been altered merely because they will be used in recycling and that the transportation of these commodities therefore should be exempt from economic regulation. The property value of the commodities is certainly altered, however, depending upon whether they are to be disposed of or recycled. In the first instance commodities possess only what might be termed a 'negative' property value, while in the recycling process they have been purchased and will not merely be discarded but, rather, will become vital elements in the manufacturing process in which they are to be utilized. It is therefore plain, we think, that waste materials purchased for use in recycling programs, such as those conducted by manufacturers of glass containers and cans, assume all of the characteristics of 'property' . . . ." (*Transportation of "Waste" Products for Reuse, supra,* 114 M.C.C. 92, 93, 104-105.) The ICC paid special attention to its definition of "waste": "We are authorizing the transportation of 'waste' products for recycling or reuse in furtherance of recognized pollution control programs. 'Waste' products shall include any product which has been or would ordinarily be discarded as worthless, defective, or of no use. [Citation.] The key word in this definition is 'discarded.' For if the product has not been or would not ordinarily be discarded, then it will not meet the criteria of being a 'waste' product . . . ." (*Id.* at p. 107.) In a subsequent proceeding the ICC stated that "to the extent that these commodities can be recycled, they have taken on the characteristics of property, although their economic value is still relatively low." (*Transportation of "Waste" Products for Reuse and Recycling* (1974) 120 M.C.C. 596, 599.) *Transportation of "Waste" Products* does not assist Chip-It. It repeatedly emphasized that recyclable material has value because it was purchased, while "waste" is implicitly discarded as worthless. The crucial definition of discarded material as waste having only " 'negative' property value" accords with the definition of waste subsequently adopted by California[10] and the understanding of Chip-It's president.[11]

There is no need to undertake a definitive parsing of these ICC decisions. It is immaterial whether Congress was mistaken or erroneously advised that

---

[10]At oral argument Chip-It insisted that the fact it picked up the material shows that the material is never allowed to "enter[] into the waste stream" and thus cannot be deemed waste. The concept of a "waste stream" is a term that is not defined by statute and appears to derive from a casual comment by our Supreme Court. (See *Waste Management of the Desert, Inc. v. Palm Springs Recycling Center, Inc.* (1994) 7 Cal.4th 478, 487, 489 [28 Cal.Rptr.2d 461, 869

"under ICC case law, garbage and refuse are not considered 'property.' " (1994 Conf. Rep., *supra*, 1994 U.S. Code Cong. & Admin. News, p. 1757.) The issue of whether what Chip-It formerly collected qualifies as property becomes relevant only if the FAA Authorization Act is applicable because it preempts local regulatory authority. What is material, and what is clear beyond any doubt, is Congress's intent that the FAA Authorization Act would have no impact on "garbage and refuse collectors." (*Ibid.*) It is that intent which is the ultimate authority in matters of preemption. (See *Medtronic, Inc. v. Lohr, supra*, 518 U.S. 470, 485 [116 S.Ct. 2240, 2250] and authorities cited.) Because that intent is so unambiguously expressed, it trumps Chip-It's elaborate efforts to rework the concept of property, even as aided by the *A.G.G.* trial court decision.

If Chip-It's preemption argument were to prevail, this court would validate a tectonic shift in power from local government to Congress. Congress, and only Congress, would have any legislative power over a subject historically left to the States and smaller units of government.[12] There is nothing in the plain language and legislative history giving any hint that Congress had

---

P.2d 440].) It has no obvious bearing on the issue of preemption. "Entering into the waste stream" is not the standard used in California for determining whether material is waste; the test is whether the material is "discarded," because only material that is without value to the person who discards it qualifies as waste according to the Waste Management Act. (*Id.* at pp. 484-488.) Property is not discarded if the owner sells it, but waste is discarded if someone is paid to take it away. (*Id.* at p. 485; *City of San Marcos v. Coast Waste Management, Inc.* (1996) 47 Cal.App.4th 320, 326 [54 Cal.Rptr.2d 588].) If Chip-It is suggesting that it should be allowed to cherry-pick refuse materials it can profitably recycle, this would upend the existing system and, as our Supreme Court put it, "render an exclusive solid waste handling franchise a nullity as a practical matter." (*Waste Management of the Desert, Inc., supra*, at p. 485.) In any event, discarded matter that the owner pays to have taken away by a specialized firm instead of a general collector is only temporarily and partially diverted from "entering into the waste stream": as Chip-It's experience demonstrates, not everything it picks up gets recycled; a not inconsiderable percentage of the materials it collects are ultimately taken to a landfill for dumping.

[11] Chip-It's president, defendant Bruce McChesney, testified at his deposition as follows: "Q. So it has always been the practice of your business that the customers that you do business with where you haul away wood or metal or concrete or whatever away from their properties, they pay you to take those materials away[?] [¶] A. Yes. [¶] Q. So these materials are all, at least insofar as that customer is concerned, waste materials from that customer, whether they might be recyclable or not[?] [¶] A. Correct."

[12] At oral argument Chip-It suggested that its preemption argument could be accepted without invalidating Pleasant Hill's exclusive franchises except as to Chip-It's inroads. This conclusion seems unlikely. Preemption is not about power sharing but excluding others from exercising power. If Congress preempts a field, it intends "to supersede state law *altogether.*" (*Fidelity Federal Sav. & Loan Assn. v. De La Cuesta, supra*, 458 U.S. 141, 153 [102 S.Ct. 3014, 3022], italics added.) Put another way, "state law that conflicts with federal law is 'without effect.' " (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407].) Moreover, the language of section 14501(c)(1) is broad—local regulatory authority is preempted as to "law, regulation, or other provision . . . related to a

such an intent when it enacted the FAA Authorization Act. The presumption against preemption of this area of traditional and preeminent local power has not been overcome. (E.g., *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., supra*, 514 U.S. 645, 654-655 [115 S.Ct. 1671, 1676]; *Medtronic, Inc. v. Lohr, supra*, 518 U.S. 470, 485 [116 S.Ct. 2240, 2250].) We therefore hold that the FAA Authorization Act, and specifically section 14501(c)(1), have not displaced California firmly established regulatory authority over garbage, refuse, or solid waste.[13]

## II

The decision to grant or deny a preliminary injunction is committed to the discretion of the trial court after the court determines (1) the likelihood that the plaintiff will prevail on the merits at trial, and (2) the relative harms suffered by the parties. (E.g., *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109 [60 Cal.Rptr.2d 277, 929 P.2d 596]; *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121].) Chip-It makes a number of claims as to why we should find that the court abused its discretion in making these determinations. The defeat of these claims will not require prolonged discussion.

The parties expend much attention to which of them is a better recycler and thus better situated to promote California's recycling policy. We decline to enter into this dispute. The dispositive issue is not factual but legal. It is undisputed that the generators of the construction and demolition debris paid Chip-It to remove that material from jobsites. Under the Waste Management Act that makes the materials discarded "waste" and therefore subject to Pleasant Hill's exclusive franchises. (Pub. Resources Code, § 40059; *Waste*

price, route, or service of any motor carrier." The conference report shows that Congress intended that the "related to" language would receive "the broad preemption interpretation adopted by the United States Supreme Court in *Morales v. TransWorld Airlines, Inc.* [(1992) 504 U.S. 374 [112 S.Ct. 2031, 199 L.Ed.2d 157]]." (1994 Conf. Rep., *supra*, 1994 U.S. Code Cong. & Admin. News, pp. 1715, 1755.) In *Morales* the court held that a "relating to rates, routes, or services" preemption provision in the Airline Deregulation Act of 1978 invalidated all state regulation that had "a connection with or reference to" the subject of the federal legislation, even if there was no actual conflict between the local and federal laws. (*Morales v. TransWorld Airlines, Inc., supra*, 504 U.S. 374, 383-387 [112 S.Ct. 2031, 2036-2038].) We cannot conceive how an exclusive franchise could escape being treated as "related to a price, route, or service."

[13]Chip-It also contends that the injunction should be reversed because it is overbroad. This argument proceeds from the assumption that federal law has preempted Pleasant Hill's franchise rights. Having refuted this assumption, we see no need to address the scope of the injunction. We do note, however, that nothing decided on this appeal restricts Chip-It's ability to apply to the trial court for a modification of the injunction as authorized by Code of Civil Procedure section 533.

*Management of the Desert, Inc. v. Palm Springs Recycling Center, Inc., supra,*
7 Cal.4th 478, 484-489.) Insofar as public policy is involved, the definitive
answer has been provided by the Legislature and our Supreme Court. It is
particularly worthy of note that California's definition of waste includes
"demolition and construction wastes." (Pub. Resources Code, § 40191, subd.
(a).)

To the extent Chip-It emphasizes its modest size and staff as compared to
Pleasant Hill and its corporate parent, this is not properly a part of the
relative harms factor. With the validity of Pleasant Hill's exclusive fran-
chises established, the difficulties that might result to Chip-It from continu-
ing to violate those franchises is irrelevant. In any event, the situation
establishes the other factor—the complete likelihood that Pleasant Hill will
ultimately prevail on the merits of its claim. "[I]f the party seeking the
injunction can make a sufficiently strong showing of likelihood of success
on the merits, the trial court has discretion to issue the injunction notwith-
standing that party's inability to show that the balance of harm tips in his
favor." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 447
[261 Cal.Rptr. 574, 777 P.2d 610].)

Chip-It contends that "the trial court's order improperly redirects recy-
clable materials into landfill," thus violating public policy and exposing the
City of Antioch to substantial fines. The premise for this contention is a
considerable misreading of the trial court's injunction. Nothing in the injunc-
tion—which we quoted at length at the outset of this opinion—"directs
recyclable materials into landfill"; all it does is prohibit Chip-It from violat-
ing Pleasant Hill's exclusive franchise. If the City of Antioch does in the
future face fines for any failure to implement the myriad provisions of the
Waste Management Act, that is the business of the city and state officials
(see Pub. Resources Code, § 41850), but it should play no part in this dispute
between private parties. Moreover, as shown above, there is considerable
public policy supporting enforcement of Pleasant Hill's franchises.

Finally, there is Chip-It's claim that Pleasant Hill did not prove that it had
enforceable franchise rights from the City of Antioch. All that Pleasant Hill
submitted to the trial court was a copy of the franchise that—unless re-
newed—would expire on August 1, 1995, plus the declaration of its general
manager stating that Pleasant Hill had in fact renewed the franchise. The
declaration does employ conclusionary language (i.e., Pleasant Hill "has
exercised all of the options to extend the franchise agreements in the
jurisdictions . . . . Therefore, the franchise agreements . . . are all cur-
rently in full force"), but it was executed under penalty of perjury. Chip-It

thereafter did not, in the trial court, press its argument that Pleasant Hill had not proven its Antioch franchise rights. There was consequently no objection to receiving the declaration and giving it the maximum evidentiary weight. (Evid. Code, § 353, subd. (a).)[14] The declaration thus constitutes substantial evidence in support of the trial court's implicit finding that Pleasant Hill had enforceable franchise rights. In light of this conclusion, we deny as moot Pleasant Hill's request to take additional evidence on appeal to establish the renewal mentioned in the general manager's declaration.

The order is affirmed.

Reardon, Acting P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied September 13, 2001, and the opinion was modified to read as printed above.

---

[14]The sole point made by Chip-It in its petition for rehearing is that it did object to the declaration. What Chip-It deems its objection is a single sentence in a four-page "sur-reply." It attacked the declaration as "self-serving," lacking in foundation, and constituting "inadmissible hearsay"; it also characterized the declaration as purporting to interpret the legal meaning of documents, i.e., the franchise agreements. A part of the declaration did purport to interpret the documents, and to that extent Chip-It's objection was sound. We do not, however, recognize the objection as one relating to the factual representation in the declaration that Pleasant Hill "has exercised all of the options to extend the franchise agreements." In the absence of such a specific objection, an appellate finding of waiver is justified. We further note that, even if we assume that the objection preserved the contract expiration issue, and further assuming that the trial court overruled the objection sub silencio, Chip-It would not be entitled to a reversal.

The general manager was competent to testify to the renewal, a matter within his personal knowledge, without the testimony constituting hearsay or the manager rendering a legal opinion on the meaning of documents. (E.g., Evid. Code, § 702; *People v. Forman* (1924) 67 Cal.App. 693, 700 [228 P. 378].)

Finally, even if we assume that Chip-It did make a specific objection that we had overlooked, we would exercise our authority to grant Pleasant Hill's renewed request to take additional evidence on appeal—a declaration by the City Attorney of Antioch, together with supporting documentation—establishing renewal of the franchise. (Code Civ. Proc., § 909; Cal. Rules of Court, rule 23). We would do this in order to affirm, and because Chip-It has never suggested it can produce any conflicting evidence. (See, e.g., 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 793-794, 796, pp. 826-827, 829.)