[No. A060784. First Dist., Div. Four. Mar. 16, 1994.]

WASTE RESOURCE TECHNOLOGIES et al., Plaintiffs, Cross-defendants and Appellants, v.
DEPARTMENT OF PUBLIC HEALTH OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents;
GOLDEN GATE DISPOSAL COMPANY et al., Interveners, Cross-complainants and Respondents.

**COUNSEL**

Reuben & Cera, James A. Reuben, Joel Yodowitz and Andrew J. Junius for Plaintiffs, Cross-defendants and Appellants.

Louise H. Renne, City Attorney, Patrick J. Mahoney, Chief Deputy City Attorney, and John D. Cooper, Deputy City Attorney, for Defendants and Respondents.

Howard, Rice, Nemerovski, Canady, Robertson & Falk, Peter J. Busch and Todd E. Thompson for Interveners, Cross-complainants and Respondents.

Burke, Williams & Sorensen, Rufus C. Young, Jr., and Virginia R. Pesola as Amici Curiae.

## OPINION

**POCHÉ, J.**—The City and County of San Francisco (City) has a long-standing practice of granting to private entities what amounts to an exclusive franchise to collect refuse. The issue presented is whether the City's authority to enter into this type of arrangement survived passage of the California Integrated Waste Management Act of 1989.[1] We conclude that the City still has the power to grant an exclusive refuse collection permit.

### BACKGROUND

In November of 1932 the voters of San Francisco adopted an initiative measure entitled the Refuse Collection and Disposal Ordinance (Ordinance).[2] It divides the City into 97 "routes for the collection of refuse." Permits to collect or dispose of refuse from each of these routes are issued by the City's director of public health. Since the 1930's the only permit recipients have been Golden Gate Disposal Company and Sunset Scavenger Company (or their predecessors in interest), which are subsidiaries of Norcal Solid Waste Systems, Inc. As a general proposition, they alone are authorized to collect, transport, or dispose of "refuse," which the Ordinance comprehensively defines as "all waste and discarded materials from dwelling places, households, apartment houses, stores, office buildings, restaurants, hotels, institutions and all commercial establishments, including waste or discarded food, animal and vegetable matter from all kitchens thereof, waste paper, cans, glass, ashes, and boxes and cuttings from trees, lawns and

---

[1] This enactment (which shall be cited hereinafter as the Waste Management Act or the Act) comprises Division 30 ("Waste Management") commencing with section 40000 of the Public Resources Code. Subsequent statutory references are to this code unless otherwise indicated.

[2] The Ordinance, which was subsequently amended in 1946, 1954, and 1960, appears as appendix A to the City's charter.

gardens."[3] A permit is not, however, required for the collection, transportation, or disposal of "waste paper or other refuse having a commercial value."

The Ordinance—most recently amended in 1960—makes no mention of recycling, which generated this litigation. Initially and primarily concerned with the collection of construction debris excluded from the Ordinance's definition of refuse (see fn. 3, *ante*), and having been blocked in their efforts to enter the recycling field, plaintiffs Waste Resource Technologies and L & K Debris Box Service, Inc., sought an injunction allowing "the collection and recycling, for a fee, of commercially valuable 'dry waste', consisting of cardboard, newspaper and other paper products, plastic bottles, sheet plastic, metal products, Styrofoam packing waste, discarded wood, and other similar commercially valuable materials."

Extensive proceedings before the trial court culminated with entry of a final judgment denying injunctive relief to plaintiffs but granting it to Norcal's subsidiaries;[4] plaintiffs were permanently restrained from soliciting, contracting, collecting, or transporting "refuse, as defined in . . . the . . . Ordinance," for a fee. Plaintiffs thereafter perfected this timely appeal.

## REVIEW

Plaintiffs attack the judgment with an array of challenges to the City's power under the Ordinance to grant and enforce an exclusive permit system which prevents plaintiffs from continuing their collection and recycling operations. Mustering a number of arguments derived from provisions of the Waste Management Act, which they claim gives them a right to collect and recycle discarded materials not within its definition of solid waste, plaintiffs contend that the City's exclusivity arrangements are now prohibited by state law. The premise for these arguments is that the Ordinance is preempted by the Act. Turning to the permit exemption the Ordinance gives to "waste paper or other refuse having commercial value," plaintiffs claim that the City's interpretation of this language has been unreasonable and arbitrary. Lastly, plaintiffs submit that if the City's course of action does not run afoul of the Waste Management Act, it nevertheless exceeds the City's police powers and thus infringes constitutional rights belonging to plaintiffs and

---

[3]Excluded from the definition of refuse are "debris and waste construction materials, including wood, brick, plaster, glass, cement, wire, and other ferrous materials, derived from the construction of or the partial or total demolition of buildings or other structures."

[4]A third Norcal subsidiary, Sanitary Fill Company, became a party during the course of proceedings in the trial court. It describes itself as owner and operator of "a transfer station . . . where in excess of 600,000 tons of refuse" collected annually by Golden Gate and Sunset Scavenger are processed and transported to the City's landfill site.

those who contract for plaintiffs' services. Plaintiffs also contend that, as to them, the City should be deemed estopped from its enforcement of the Ordinance.

Because it proves largely dispositive of these arguments, the preemption issue will be addressed first.

I

The City has constitutional authorization to "make and enforce within its limits all local, police, sanitary, or other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) Prior to passage of the Waste Management Act, a substantial body of law upheld the police power of a municipality or unit of local government to legislate on the issue of refuse.[5] Equally well established was the concomitant right to grant an exclusive franchise or permit for refuse collection. (E.g., *Reduction Company* v. *Sanitary Works* (1905) 199 U.S. 306, 316-317 [50 L.Ed. 204, 208-209, 26 S.Ct. 100]; *In re Zhizhuzza* (1905) 147 Cal. 328, 335 [81 P. 955]; *Matula* v. *Superior Court* (1956) 146 Cal.App.2d 93, 98-99 [303 P.2d 871]; *Ponti* v. *Burastero* (1952) 112 Cal.App.2d 846, 851-853 [247 P.2d 597]; *Davis* v. *City of Santa Ana* (1952) 108 Cal.App.2d 669, 676-677 [239 P.2d 656]; *In re Sozzi* (1942) 54 Cal.App.2d 304, 306 [129 P.2d 40]; 7 McQuillin, Law of Municipal Corporations (3d ed. 1989) §§ 24.242, 24.245, 24.249-24.251.)

 Preemption can be either express or implied. The Waste Management Act does not include anything like the plain language needed for express preemption.[6] Preemption by implication exists when the scope or the goal of state legislation necessitates the abrogation of local regulation. This is what plaintiffs obliquely contend has been done to the Ordinance by the Act. The governing principles are familiar and fixed:

[5] For the moment, we use "refuse" as an inclusive generic having no different meaning from other, equally familiar terms (e.g., trash, garbage, rubbish, etc.).

[6] Such as "The Legislature . . . finds that divergent and competing local tax measures imposed on financial corporations impair the uniform statewide regulation of banks and financial corporations. For this reason . . . the Legislature declares that the state, by this amendment, has preempted such local taxation" (Stats. 1979, ch. 1150, § 20, p. 4220) and "It is the intent of the Legislature that this article preempt all local regulations . . . concerning the transportation of hazardous waste . . . . No state agency, city, city and county, county, or other political subdivision of this state, including, but not limited to, a chartered city, city and county, or county, shall adopt or enforce any ordinance or regulation which is inconsistent with the rules and regulations adopted . . . pursuant to this article." (Health & Saf. Code, § 25167.3.)

For additional examples of state legislation held to oust local efforts, see *In re Murphy* (1923) 190 Cal. 286, 288 [212 P. 30]; *Ex parte Daniels* (1920) 183 Cal. 636, 641 [192 P. 442, 21 A.L.R. 1172].

■ "In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' . . . [¶] ■ Preemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations. Similarly, it should not be found when the statutory scheme recognizes local regulations." (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 485 [204 Cal.Rptr. 897, 683 P.2d 1150] [citations omitted]; accord, *IT Corp.* v. *Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 90-91, 94 [text & fn. 10] [2 Cal.Rptr.2d 513, 820 P.2d 1023].)

The purposes of the Waste Management Act are "to reduce, recycle, and reuse solid waste generated in the state to the maximum extent feasible in an efficient and cost-effective manner to conserve water, energy and other natural resources, to protect the environment, to improve regulation of existing solid waste landfills, to ensure that new solid waste landfills are environmentally sound, to improve permitting procedures for solid waste management facilities, and to specify the responsibilities of local governments to develop and implement integrated waste management programs" (§ 40052). Diminishing landfill space was a particular concern. (See §§ 40000, 41780, 42861, 42870-42871, 46001.)

The Legislature intended to establish a "comprehensive program for solid waste management" (§ 40002) and the purview of the Waste Management Act is indeed broad, extending to what is done with "metallic discards" (§§ 42160-42165), a variety of paper products (§§ 42200-42222, 42550-42563, 42750-42791), composted materials (§§ 42230-42247), plastics (§§ 42300-42380), retreaded tires (§§ 42400-42416), lead-acid and household batteries (§§ 42440-42450), household hazardous waste (§§ 47000-47550), and oil (§§ 48600-48691).

The Act reconstituted a state Integrated Waste Management Board (§§ 40400-40510) with the power to adopt "minimum standards" for solid waste handling and disposal (§ 43020; see § 40502). This board has many

responsibilities, among which are approving the integrated waste management plans that all cities and counties must prepare (§§ 41750, 41800), regulating closed and active landfills (§§ 43500-43606, 46000-46507), and administering a fund taking in $20 million annually (§§ 47900-48008; see § 46801). The board is also vested with the power to enforce the Act using a number of corrective actions (e.g., cease-and-desist orders, cleanup orders, civil penalties) (§§ 43300, 45000-45201).

But if the scope of the Waste Management Act is broad, it was not achieved by elbowing local government off the stage. Quite the contrary, the Legislature expressly declared that ". . . the responsibility for solid waste management is a shared responsibility between the state and local governments" (§ 40001, subd. (a)), and that local governmental responsibilities "are integral to the successful implementation" of the Act (§ 40703, subd. (a)). There are numerous provisions directing the state board to consult and coordinate with local governmental agencies (§§ 40703, 40914, 43301, 43307) and provide them with myriad types of assistance and information (§§ 40001, subd. (b), 40910, 41791.2, 42500, 42501, 42511, 42540, 42600, subds. (e)-(f), 42650, 43217, 47003, 47103). It is the cities and counties, each of which must designate a "local enforcement agency," that have the primary responsibility for policing the Act, with the state board providing oversight (§§ 43200-43309, 44001-44018, 44100-44106, 44300-44817, 45000-45407).

In order to sustain plaintiffs' preemption claim, we would have to conclude that with passage of the Waste Management Act the state's entry into the field of refuse collection and disposal is so overshadowing that it obliterates all vestiges of local power as to a subject where municipalities have traditionally enjoyed a broad measure of autonomy. The difficulties to such a conclusion are simply too great.

It should be apparent from the preceding statutory survey that the Waste Management Act looks to a partnership between the state and local governments, with the latter retaining a substantial measure of regulatory independence and authority. When the Legislature wanted to forbid local initiatives, it knew and used language appropriate to that goal in the Act.[7] The very narrow express quashing of local power in the Act undermines plaintiffs' claim of implied preemption. (See *IT Corp.* v. *Solano County Bd. of Supervisors, supra,* 1 Cal.4th 81 at pp. 94-95.)

---

[7]The conspicuously unique flat taboo in the Waste Management Act is section 43208, which provides that ". . . no local governing body may enact, issue, enforce, suspend, revoke, or modify any ordinance, regulation, law, license, or permit . . . so as to prohibit or unreasonably regulate the operation of, or the disposal, treatment, or recovery of resources from solid wastes" by a specified type of facility.

In addition, much in the Waste Management Act indicates that the Legislature did not intend a wholesale preclusion of political subdivisions' regulatory power. There are many provisions attesting to the Legislature's desire to have state and local authorities work together in a cooperative effort. The Act leaves unimpaired local authority to "impose and enforce reasonable land use conditions or restrictions on solid waste management facilities" (§ 40053; see §§ 41851, 42023, 43208). It also includes an express grant of authority for local government to legislate increased penalties for unauthorized removal of specified materials (§ 41954). Moreover, the provision directing the state board to promulgate "minimum standards for solid waste handling . . . and disposal" (§ 43020) clearly suggests the possibility of local governments adopting additional standards. This also weighs against implied preemption. (See *Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 886-888 [218 Cal.Rptr. 303, 705 P.2d 876].)

Courts "will be reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another." (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 707 [209 Cal.Rptr. 682, 693 P.2d 261].) The Waste Management Act was in large measure a consolidation and recodification of existing law. (See Stats. 1989, ch. 1095, § 32, pp. 3899-3900; Legis. Counsel's Dig., Assem. Bill No. 939, 4 Stats. 1989 (Reg. Sess.) Summary Dig., p. 409.) Prior to its passage courts accepted that, state legislation notwithstanding, the dominant role in refuse handling belonged to localities. (E.g., *City of Fresno* v. *Pinedale County Water Dist.* (1986) 184 Cal.App.3d 840, 847 [229 Cal.Rptr. 275]; *Matula* v. *Superior Court, supra,* 146 Cal.App.2d at pp. 99-101.) The antecedent statutes were viewed as acknowledging that allowance had to be made for "the unique circumstances of individual communities" and that the Legislature had therefore "empowered local governments to adopt refuse regulations which would best serve the local public interest." (*City of Camarillo* v. *Spadys Disposal Service* (1983) 144 Cal.App.3d 1027, 1031 [193 Cal.Rptr. 22].)

It is self-evident that the way in which Los Angeles deals with refuse may be entirely different from the approach of a small rural town. Provisions of the Waste Management Act demonstrate that the Legislature took account of this reality. It knew that factors such as geography and population density might require a different approach (see §§ 40973, 41782, 42500, 46203). Local conditions transcending city or county boundaries might require collection and disposal to be handled on a regional basis, and the Legislature encouraged such efforts (see §§ 40001, subd. (b), 40002, 41791.2). It therefore made provision in the Act for the creation and operation of regional

agencies (§§ 40970-40975), garbage disposal districts (§§ 49000-49050), and garbage and refuse disposal districts (§§ 49100-49195).

Touching all of these points, and close to being dispositive by itself, is section 40059 (Government Code former section 66757). Given its importance, it deserves quotation in full:

"(a) Notwithstanding any other provision of law, each county, city,[8] district or other local governmental agency may determine all of the following:

"(1) Aspects of solid waste handling which are of local concern, including, but not limited to, frequency of collection, means of collection and transportation, level of services, charges and fees, and nature, location, and extent of providing solid waste handling services.

"(2) Whether the services are to be provided by means of nonexclusive franchise, contract, license, permit, or otherwise, either with or without competitive bidding, or if, in the opinion of its governing body, the public health, safety, and well-being so require, by partially exclusive or wholly exclusive franchise, contract, license, permit, or otherwise, either with or without competitive bidding. The authority to provide solid waste handling services may be granted under terms and conditions prescribed by the governing body of the local governmental agency by resolution or ordinance.

"(b) Nothing in this division modifies or abrogates in any manner either of the following:

"(1) Any franchise previously granted or extended by any county or other local governmental agency.

"(2) Any contract, license, or any permit to collect solid waste previously granted or extended by a city, county, or a city and county."

A number of conclusions—all of which are adverse to plaintiffs—can be extracted from this statute. First, the Legislature recognized that not every aspect of the solid waste problem could be handled in the Waste Management Act; the infinite details of actual day-to-day operations could not be resolved in Sacramento. Second, the Legislature further recognized that those details should more appropriately be specified by local authorities with

---

[8]As the state's sole city and county, San Francisco qualifies as both a city and a county for purposes of the Waste Management Act (§ 40115).

greater knowledge of local conditions. Third, the Legislature made express provision for this element of local regulation. Fourth, the Legislature left local authorities the option of deciding that local circumstances attending solid waste handling would be best served by an exclusive service.[9] The gist of these conclusions is the Legislature's considered opinion that there was no need for statewide uniformity which outweighed the advantages of local governments retaining the power to handle problems peculiar to their communities.

We do not believe that the Waste Management Act represents a fundamental change in the Legislature's traditional outlook towards the subject of waste handling. Section 40059—as well as the entire scope of the Act—establishes the Legislature's awareness that " 'substantial[] geographic, economic, ecological or other distinctions are persuasive of the need for local control' " and thus precludes the subject from being " 'comprehensively dealt with at the state level.' " (*Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 863-864 [76 Cal.Rptr. 642, 452 P.2d 930].) Beyond question, the Act not only anticipates and tolerates, but as a practical matter demands, supplementary local regulation to spell out the details of solid waste collection and disposal. This is "convincing evidence that the state legislative scheme was not intended to occupy the field." (*IT Corp.* v. *Solano County Bd. of Supervisors, supra*, 1 Cal.4th at p. 94, fn. 10.) These factors demonstrate that there is no exclusive or even paramount state concern which requires disabling traditional local power in this area. There being no argument made concerning the impact upon transient citizens, not one of the three tests for implied preemption is satisfied. We find no legislative intent to displace deeply entrenched local authority. (See *City of Dublin* v. *County of Alameda* (1993) 14 Cal.App.4th 264, 275-279 [17 Cal.Rptr.2d 845].) Moreover, we conclude that the City's Ordinance harmonizes with the Waste Management Act and furthers its purpose.

## II

With the preemption issue decided, plaintiffs' remaining contentions are very easily resolved.

Plaintiffs' arguments construing various provisions of the Waste Management Act look to finding statutory authorization for their conduct. The jumping-off point for all of these creative arguments is the premise that the

---

[9]The trial court had before it evidence that most local governments in California have opted for exclusive garbage collection arrangements. The fact that 78 municipalities appear as amici curiae in support of the City tends to show that the practice is indeed widespread.

Ordinance, having been preempted, is no longer a factor. But because the Ordinance is not preempted, it is the governing authority; it is the Act which has become irrelevant.

■ As for plaintiffs' claim that the materials they wish to collect do not pose a genuine threat to public health or safety and thus are beyond the reach of municipal police power, the City's contrary determination is to be taken as "well-nigh conclusive." (*Berman* v. *Parker* (1954) 348 U.S. 26, 32 [99 L.Ed. 27, 37, 75 S.Ct. 98].) The factors explored in the following paragraphs support the plausibility of that determination, which must therefore be upheld. (E.g., *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 490 [234 P. 381, 38 A.L.R. 1479]; *Ex parte Lacey* (1895) 108 Cal. 326, 328-329 [41 P. 411].) Once that is done, the subject matter nestles comfortably within the City's valid police powers. (E.g., *City of Fresno* v. *Pinedale County Water Dist., supra,* 184 Cal.App.3d at p. 847.) Those powers, which have been described as "whatever will promote the peace, comfort, convenience, and prosperity" of the City's citizens (*Escanaba Co.* v. *Chicago* (1882) 107 U.S. 678, 683 [27 L.Ed. 442, 445, 2 S.Ct. 185]) should "not be lightly limited." (*Miller* v. *Board of Public Works, supra,* at pp. 484-485.) They are presumed exercised in good faith and a constitutional manner. (E.g., *Ex parte Hadacheck* (1913) 165 Cal. 416, 421-422 [132 P. 584]; *Barenfeld* v. *City of Los Angeles* (1984) 162 Cal.App.3d 1035, 1040 [209 Cal.Rptr. 8].) Plaintiffs have not established otherwise.

An ordinance enacted pursuant to a municipality's police powers may be nullified if palpably unreasonable, arbitrary, or capricious. (E.g., *Barenfeld* v. *City of Los Angeles, supra,* 162 Cal.App.3d at p. 1040; *Brix* v. *City of San Rafael* (1979) 92 Cal.App.3d 47, 50-51 [154 Cal.Rptr. 647].) As previously mentioned, the Ordinance requires no permit for collection and disposal of "waste paper or other refuse having a commercial value." The city attorney initially interpreted "commercial value" from the standpoint of the collector of the refuse, but since 1964 has advised that "commercial value" should be viewed from the vantage point of the producer of the refuse. The City demonstrated that the different perspectives are intrinsically linked and are in fact somewhat circular. In brief, it has shown that the economic advantages accruing from exclusivity result in lower charges (for residential as opposed to commercial users) and increased efficiency in a number of programs (e.g., a curbside recycling program) that benefit refuse producers.[10] Although reasonable minds could differ as to the wisdom of the policy behind it, the City's revised interpretation is now of long duration and must

---

[10] It would not be improper for the City to think that new entrants into the waste field would be inimical to the public good by hindering efficient and effective enforcement of the

be respected as not unreasonable, arbitrary, or capricious. (E.g., *Miller* v. *Board of Public Works, supra,* 195 Cal. 477 at p. 490; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722].)

■ Plaintiffs submit that the ordinance violates their "explicit constitutional property rights . . . to work and earn a living from any legitimate business pursuit." Although plaintiffs are probably not entitled to argue that the manner in which the City enforces the Ordinance infringes upon the rights of plaintiffs' once and future customers to acquire, possess, protect, and dispose of property (see *In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305]), we will reach the merits because they are so clear-cut. It having already been shown that the Ordinance may be validly enforced as within the City's police powers, long-established authority holds that intrusions upon property incidental to the exercise of those powers, are accepted as *damnum absque injuria.* (E.g., *Reduction Company* v. *Sanitary Works, supra,* 199 U.S. 306, 324-325 [50 L.Ed.2d 204, 212-213]; *In re Zhizhuzza, supra,* 147 Cal. at p. 335; *In re Pedrosian* (1932) 124 Cal.App. 692, 700-701 [13 P.2d 389].) As stated by our Supreme Court, ". . . the very essence of the police power . . . is that the deprivation of individual rights and property cannot prevent its operation" (*Beverly Oil Co.* v. *City of Los Angeles* (1953) 40 Cal.2d 552, 557 [254 P.2d 865]).

As for plaintiffs' estoppel argument, we will not address the merits of this factual issue which is unveiled here for the first time. (See *California Teachers' Assn.* v. *Governing Board* (1983) 145 Cal.App.3d 735, 746 [193 Cal.Rptr. 650]; *Coast Electric Co.* v. *Industrial Indemnity Co.* (1983) 144 Cal.App.3d 879, 886, fn. 3 [193 Cal.Rptr. 74].)

The judgment is affirmed.

Anderson, P. J., and Reardon, J., concurred.

---

Ordinance. (See *City of Fresno* v. *Pinedale County Water Dist., supra,* 184 Cal.App.3d 840, 847; *Sievert* v. *City of National City* (1976) 60 Cal.App.3d 234, 237 [131 Cal.Rptr. 358].)