RUBIN, J., Concurring and Dissenting.
I respectfully dissent from that part of the majority opinion affirming the granting of summary adjudication of appellant’s claim that the city’s authorization of expansion of the Bradley *1136 Landfill site violates the antidiscrimination provisions of Government Code section 11135.[1] At a time when federal, state and local governments are calling for increased vigilance to stop imposing disproportional environmental burdens on lower income communities, the majority discards a potential tool for the enhancement of environmental justice. In so doing, the majority rejects the legislative mandate to interpret section 11135 broadly. (§ 11139.) Instead, the court’s opinion holds that conduct by the City of Los Angeles (City) which is alleged to discriminate against a predominately Latino community is not subject to California’s antidiscrimination statute. I would reverse the order granting summary judgment as it relates to the section 11135 claim. I do agree with the majority that the trial court erred in granting summary adjudication of the California Environmental Quality Act (CEQA) claims, and I join in part 2 of the Discussion in the majority opinion.
For these reasons, I would reverse outright the summary judgment.

Introduction

Our Legislature has enacted a number of antidiscrimination statutes during the 163 years of California’s existence. (See, e.g., Gov. Code, § 12900 et seq. [employment and housing discrimination]; Civ. Code, § 51 et seq. [Unruh, Ralph and Bane Civil Rights Acts]; Ins. Code, § 1861.03 [insurance discrimination]; Civ. Code, § 1747.50 [issuance of credit cards]; Ed. Code, § 234 [Safe Place to Learn Act; safe school environment prohibiting discrimination]; Earn. Code, §§ 7950, 8708 [foster program, adoption]; Gov. Code, § 11131 [no government meetings at facilities that discriminate]; Lab. Code, § 1735 [public works contractors may not discriminate].)[2]
Section 11135 is one of these antidiscrimination statutes. Its focus is direct as it deals with public and private sector “programs and activities” that receive state financial assistance. It bars discrimination in those programs and activities. The language of section 11135 is plain and its scope apparent: “No person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Notwithstanding Section 11000, this section applies to the California State University.” (Id., subd. (a).)
*1137 The statute by its terms prohibits (1) discrimination based on any of 10 factors (2) in programs or activities that (a) are conducted, operated or administered by the state, (b) funded directly by the state, or (c) receive any financial assistance from the state.
The California Code of Regulations implementing section 11135 states the same: “No person in the State of California shall, on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability, be unlawfully denied the benefits of, or be unlawfully subjected to discrimination under any program or activity funded directly by the State or receiving any financial assistance from the State.” (Cal. Code Regs., tit. 22, § 98100.) No recipient of state funds may discriminate in “carrying out any program or activity directly, or through contractual, licensing or other arrangements.” (Id., § 98101.) “Recipient” includes local agencies with a minimum number of employees and which receive a threshold level of state funds. (Id., § 98010.) The statute’s importance is underscored by regulations that eliminate the need to exhaust administrative remedies as a condition to judicial enforcement (id., § 98003) and that expressly preempt conflicting local laws (id., § 98005).
Section 11135 does not expressly mention discrimination in environmental matters or any other classification of programs or activities where discrimination is prohibited. As the statute is to be interpreted broadly (§ 11139), I see no reason, and the parties have suggested none, why the statute does not apply to the waste management activities here, provided the other requirements of the statute have been satisfied. Nevertheless, I pause briefly to discuss the role of antidiscrimination laws in the environmental field.
It is probably correct that antidiscrimination statutes have historically been applied more in areas such as housing, employment, public access, and voting than to environmental programs. Nevertheless there is an emerging awareness that government and private sector activities may have a disparately negative environmental impact on low-income or minority communities. Efforts to eradicate the adverse environmental effects of projects in less affluent neighborhoods are often described as “Environmental Justice.”
The California Senate and Assembly this month passed Assembly Bill No. 1329 (2013-2014 Reg. Sess.) which embodies the goals of environmental justice. Section 1 declares: “The Legislature finds and declares all of the following: [j[] (a) California’s public health and environmental protection programs, policies, and activities should be conducted in a manner that promotes equity and affords fair treatment, accessibility, and protection for all residents, regardless of race, age, culture, income, or geographic location, [f] (b) To that end, the California Environmental Protection Agency has worked *1138 for a decade to develop and implement an environmental justice initiative that ensures fair and equitable environmental policies for all residents. [][] (c) Through that initiative, the California Environmental Protection Agency has worked to identify those communities that are most impacted by pollution and environmental contamination. [][] (d) California needs to provide the greatest level of attention and protection to those communities that are at the greatest risk from those impacts.” (Legis. Counsel’s Dig., Sen. Cone. Amends, to Assem. Bill No. 1329 (2013-2014 Reg. Sess.), italics added.)[3]
The City, respondent here, is at the forefront of environmental justice. The Los Angeles City Attorney’s Office “leads the Environmental Protection Strike Force, a group of federal, state and local agencies that work together, share resources, and exchange information to more effectively and consistently enforce environmental protection laws. The Strike Force prioritizes the prosecution of businesses and individuals whose activities and operations diminish or disproportionately affect the quality of life for Los Angeles’s residents, particularly those in close proximity to schools and those in lower income neighborhoods.” (L.A. City Atty. Web site <http://www.atty.lacity.org/ CRIMINAL/EnvironmentalUnit/index.htm> [as of Sept. 20, 2013], italics added.)
The South Coast Air Quality Management District also has an environmental justice program: “The purpose of AQMD’s Environmental Justice program is to ensure that everyone has the right to equal protection from air pollution .... [f] Environmental Justice, or ‘EJ’ has been defined by AQMD as: ‘. . . equitable environmental policymaking and enforcement to protect the health of all residents, regardless of age, culture, ethnicity, gender, race, socioeconomic status, or geographic location, from the health effects of air pollution.’ ” (South Coast Air Quality Management Dist. Web site <http://www.aqmd.gov/ ej/index.htm> [as of Sept. 20, 2013], some italics omitted.)
A similar mission statement can be found in the home page for the California Environmental Protection Agency: “The California Environmental Protection Agency (CalEPA) and our boards, departments, and office (BDOs) shall accord the highest respect and value to every individual and community, by developing and conducting our public health and environmental protection programs, policies, and activities in a manner that promotes equity and affords fair treatment, accessibility, and protection for all Californians, regardless of race, age, culture, income, or geographic location.” (Cal/EPA Web site <http://www.calepa.ca.gov/EnvJustice> [as of Sept. 20, 2013], italics added.)
*1139 Finally, the notion of environmental justice has also been adopted by the federal EPA. (EPA Web site <http://www.epa.gov/environmentaljustice> [as of Sept. 20, 2013].)
To synthesize my prefatory observations: (1) California has been a national leader in the enactment of antidiscrimination laws; (2) one of those laws is section 11135, which prohibits discrimination in programs and activities that receive state funding; (3) antidiscrimination laws are increasingly being used by government to achieve a measure of environmental justice, especially where quality of life is diminished “in lower income neighborhoods.” (L.A. City Atty. Web site <http://www.atty.lacity.org/CRIMINAL/EnvironmentalUnit/index. htm> [as of Sept. 20, 2013.)
With this historical and legislative context in mind, I now turn to the application of section 11135 to Los Angeles’s waste management program.

Overview of City/State Participation Under the Waste Management Act

The majority has already summarized the relationship between the City and the state under the California Integrated Waste Management Act of 1989 (Act). (Pub. Resources Code, § 40050.) I will therefore be brief. When the Legislature enacted this legislation in 1989, it intended to establish a “ ‘comprehensive program for solid waste management.’ ” (Waste Resource Technologies v. Department of Public Health (1994) 23 Cal.App.4th 299, 305 [28 Cal.Rptr.2d 422].) Under the Act, waste management is a shared responsibility between the City and the state, and the City does not suggest that the authorization of the Bradley Landfill was anything other than the City playing its part in its legal duty to deal with solid waste. (Pub. Resources Code, § 40001.)[4] Public Resources Code section 40002, subdivision (a) states: “As an essential part of the state’s comprehensive program for solid waste management ... the Legislature declares that it is in the public interest for the state, as sovereign, to authorize and require local agencies, as subdivisions of the state, to make adequate provision for solid waste handling . . . .” *1140 (Pub. Resources Code, § 40052 [local governments responsible for developing and implementing integrated waste management programs].)
Initially, the California Integrated Waste Management Board oversaw implementation of the Act, but the board has since been replaced by CalRecycle. (Pub. Resources Code, § 40400.) CalRecycle’s responsibilities include approving the integrated waste management plans that all cities and counties must prepare and regulating closed and active. landfills. (Pub. Resources Code, §§ 41750, 41800, 43500-43606.) Under the Act, the City is obligated to designate a “Local Enforcement Agency” (LEA). (Pub. Resources Code, § 43202.)[5] If the City fails to designate an LEA, CalRecycle becomes the enforcement agency, with the City essentially ceding power to the State. (Pub. Resources Code, § 43202.)
The LEA inspects and enforces state, federal, and local laws regarding the collection, handling, storage, and disposal of waste. In particular, the LEA enforces CalRecycle’s rules regarding solid waste handling and issues permits when those permits comply with CalRecycle’s standards. (Pub. Resources Code, § 43209.)[6] The LEA also approves solid waste permits, as to which CalRecycle must either concur or object; assuming CalRecycle’s concurrence, the LEA issues the permit. (Pub. Resources Code, §§ 43209, 44001.) To ensure solid waste facilities comply with laws and permits governing their operation, the LEA is also responsible for monthly inspections of the facilities. (Pub. Resources Code, § 43209, subds. (a)-(b).)[7]

The City’s Role in the Expansion of Waste Facilities Here and Its Claimed Effect on Appellant

The present dispute was prompted by the decision of the City, through its City Council, to certify an environmental impact report (EIR) and approve *1141 the request of real party in interest Waste Management Recycling and Disposal Services of California, Inc.’s (Waste Management), to build new and expanded waste management facilities at the Bradley Landfill in Sun Valley. The City’s planning department (Planning Department) acted as the lead agency in the authorization process.
Appellant’s complaint alleged the City violated section 11135 by allowing real party in interest Waste Management to expand the Bradley Landfill in a predominately Latino community already heavily burdened with more than its share of environmentally harmful businesses and facilities. The complaint stated: “The City Council’s approval of the [challenged facilities] violates Government Code [section] 11135 in that the adverse effects of the [challenged facilities] will disproportionately impact a community that is predominately Latino. The City Council’s approval of the [challenged facilities] thus subjects plaintiffs and other Sun Valley minority residents to discrimination by locating the [challenged facilities] and expansion of the greenwaste processing in an area with predominantly Latino residents.” The approval of the challenged facilities “has the intended and unintended effect of subjecting the residents of Sun Valley to substantially more air and groundwater pollution, and more truck traffic, odor, noise, trash and vermin than most or all other parts of the City.”

The City Cannot Distance Itself from Its Own Department

The majority and I agree that the resolution of this appeal turns on the meaning of “program or activity” under section 11135, subdivision (a). More precisely: Who is doing what in the waste management program? If the City’s conduct in approving permits and certifying the EIR for the Bradley Landfill was part of the City’s role under the Act and if the City receives state funding as part of that program, then the statute applies.
The trial court granted summary adjudication on the stated ground that the state did not fund the conduct of which appellant complained: the City’s approval.under its zoning requirements of permits for Waste Management to expand the challenged facilities and the City’s approval of locating those facilities in Sun Valley. Thus, the correctness of summary adjudication turns on the scope of the “program or activity” that appellant challenges under section 11135, and the trial court correctly understood as much. At the hearing on summary adjudication, the court observed, “The plaintiffs essentially define the project [sic: program] or activity as the city’s entire overall umbrella waste management program . . . and the city and Waste Management define it differently as the land use approval process, [f] So the *1142 definition of program or activity is a central issue here.” Because the court found the challenged “program” was limited to land use decisions involving zoning and permitting, it concluded appellant’s section 11135 claim failed. The court rejected appellant’s contention that the participation of the City’s LEA, a recipient of state funding, in the City’s waste management activities put the City’s approval of the landfill’s expansion under section 11135’s purview. The court reasoned that because the LEA did not itself approve the permitting and expansion of the landfill, the LEA did not make the City liable under section 11135. The court explained, “So if the L.E.A. is not part of the program or activity which approved this project, then the project didn’t get any state funds.” The court’s order granting summary adjudication found the LEA was “not significantly involved in the land use decision challenged by [appellant] . . . and therefore ... its involvement in this case did not trigger the application of Section 11135.”
There is no quarrel about the receipt of state funds. The LEA receives state money. For the last decade, CalRecycle (or its predecessor) gave the LEA over $50,000 a year to assist the City’s waste management program. Among other things, those funds have been used to purchase items used for inspections such as clothing, machinery, and tools, and it is undisputed such inspections would occur at the challenged facilities if they are constructed. Because the LEA receives state money, and assuming the LEA has some separate existence, section 11135 applies to the LEA itself. This does not appear to be in dispute, nor is it the issue this appeal needs to decide.
The majority has essentially adopted the trial court’s reasoning. It holds that the City Council’s action here was not part of a program or activity that receives state funding because neither the City nor City Council received state monies as part of the approval process. In my view, this conclusion suffers from two flaws. First, it assumes that the LEA is an entity separate from the City. The majority thus wrongly concludes that the LEA’s involvement in the waste management activities targeted by Comunidad’s lawsuit was immaterial. The second area in which I disagree has to do with the interpretation of “program and activity.” The majority essentially tries to extract the permit issued by the City and its Planning Department from the City’s waste management program and to put that permit in a realm wholly unconnected to the solid waste facilities permit issued by the LEA.
Taking these points in order, the record does not support the conclusion that the LEA is a separate entity from the City and therefore the receipt of funds by the LEA is not the receipt of funds by the City. The majority’s only legal authority for this proposition is a reference in a CEQA case, No Wetlands *1143 Landfill Expansion v. County of Marin (2012) 204 Cal.App.4th 573 [138 Cal.Rptr.3d 873] (No Wetlands). In that decision, a landfill operator in Marin County applied for revisions to a solid waste facilities permit. (Id. at p. 578.) The CEQA required the operator to prepare an EIR on the proposed revisions and to submit the EIR to the CEQA “lead agency” in the landfill’s jurisdiction. In Marin County, the CEQA lead agency was the Marin County Environmental Health Services (Marin County EHS); by coincidence, Marin County EHS was also the LEA empowered to enforce the Act in Marin County although the Act was not before the court. (204 Cal.App.4th at pp. 578-579.) The Marin County EHS thereafter certified the EIR of the proposed revisions to the solid waste facilities permit.
The plaintiffs in No Wetlands challenged the certification of the EIR and took their challenge to the Marin County Board of Supervisors. (No Wetlands, supra, 204 Cal.App.4th at p. 579.) The issue on appeal in No Wetlands was whether the board of supervisors had the authority to hear the appeal from the certification of the EIR by the Marin County EHS. No Wetlands held “no.” (Id. at pp. 577, 580.) The appellate court explained, “Approval of the landfill permit, and certification of the EIR for that approval, is a power vested in a local enforcement agency not the county itself. The local enforcement agency is a distinct legal entity from the county. The county board of supervisors has no authority to approve or disapprove the project at issue and thus is not a ‘decisionmaking body’ [as defined under CEQA] empowered to hear plaintiffs’ administrative appeal. [Citations.] Plaintiffs’ challenge to the adequacy of the EIR lies in the superior court, to which we remand this case.” (Id. at pp. 577-578, fn. omitted.)
Seizing on the appellate court’s phrase “[t]he local enforcement agency [(i.e. Marin EHS)] is a distinct legal entity from the county,” the majority concludes that the City’s LEA is a separate legal entity distinct from the City, and therefore the LEA’s receipt of state funds cannot be imputed to the City or the City’s waste management program. The City misrelies on the quoted phrase. Language in a court decision must be understood within the context of that decision’s facts. (Ginns v. Savage (1964) 61 Cal.2d 520, 524 fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689]; Plotnik v. Meihaus (2012) 208 Cal.App.4th 1590, 1606 [146 Cal.Rptr.3d 585].) In No Wetlands, the context was a challenge under CEQA to an EIR’s certification, and the question was which public body (the Board of Supervisors or the superior court) had the right to rule on that challenge. No Wetlands looked to CEQA to answer that question, and the language in No Wetlands describing a local enforcement agency as a “distinct legal entity” must be understood in that context. (No Wetlands, supra, 204 Cal.App.4th at p. 577, citing Pub. Resources Code, § 21151, subd. (c) & CEQA regulations as authority for its holding.) No Wetlands’s holding is *1144 limited to its declaration that under CEQA the Marin County Board of Supervisors does not have reviewing authority over an EIR certified by the county’s EHS department. It is essentially an appellate review case. (No Wetlands, at pp. 584-587.) It does not purport to analyze for purposes of antidiscrimination statutes the relationship between an LEA and the city that created it. Indeed, the opinion does not mention section 11135.
In contrast to the absence of any legal authority that the LEA here is separate from the City for purposes of section 11135’s “program or activity,” the factual record in this case shows that the LEA and the City are essentially one, or perhaps more accurately, the former is part of the latter. Under the Act, the City must designate an LEA. (Pub. Resources Code, § 43202.) When the Act took effect in 1989, the City selected its environmental affairs department as the LEA. City records reveal that the City designated that department a “Major City Agency” in the City’s “Solid Waste Management Policy Plan” prepared as part of the City’s compliance with the Act. Records point out that a total of 25 separate major City agencies, including the Planning Department, had “a role in the success of the City meeting the goals” of its “Solid Waste Management Policy Plan.” In 2010, the City transferred the role of LEA from its environmental affairs department to its department of building and safety. Stated slightly different, two different City departments have acted as the LEA under the Act. City departments are a subpart of the municipal government and their actions are the actions of the local government. (People v. Parmar (2001) 86 Cal.App.4th 781, 799 [104 Cal.Rptr.2d 31].)
Neither in 1989 nor thereafter did the City decide to participate in the creation of a new entity to act as the LEA, one that was comprised of representatives from the City and other local municipal entities. It did not create or participate in a joint powers authority (§ 6500 et seq.) or similar entity.[8] It first designated the City’s environmental affairs department, then its building and safety department as the LEA. The original package of materials the City filed with the California Integrated Waste Management Board in 1999 stated that the environmental affairs department was designated the LEA and the name of the governing body of the LEA was “Los Angeles City Council, John Ferraro—President.”
*1145 Either one city department or another has at all times been the LEA, and it is that City department acting as an LEA under the Act that has received state funds under the Act. City records state plainly that the permanent LEA staff consists entirely of “full-time city employees from the City of Los Angeles Department of Building and Safety Code Enforcement Bureau who are currently in place and will remain in a direct role as part of the LEA program.” (City of L.A., Dept, of Building and Safety, Enforcement Program Plan (Aug. 2010) p. 91.) The budget is established by the City Council with the approval of the mayor. Recovery of the cost to the City of funding the LEA was to be accomplished by amendment to the Los Angeles Municipal Code. (Enforcement Program Plan, at p. 116.) The City’s plan stated, “The projected budget for the LEA program for fiscal year 2010-2011 is projected at $1,762,618. This includes all direct and indirect costs and provides for a supplemental billing to all permitted facilities to offset increased program costs due to the increased responsibility of the City’s LEA.” (Id. at p. 118.)
In my view one cannot realistically separate the LEA from the City. What the LEA is doing is discharging the City’s statutory obligations under the Act. (Pub. Resources Code, §§ 40001, 40052, 43202.) Stated differently the City’s building and safety department is acting as the local agency designated to enforce the Act.
The second flaw in the majority’s reasoning, in my opinion, is its attempt to isolate the decision of the Planning Department and the City Council in approving zoning approvals and certifying the EIR from the waste management “program or activity” under section 11135. Appellant refers to the City Council decision as “actions” which are outside the waste management program, as if they exist on some separate footing divorced from the context in which they were made. The City’s own Solid Waste Management Policy Plan belies the compartmentalization the majority has adopted. As far back as 1993 when the City’s environmental affairs department was the LEA, the City’s report on the implementation of the Act stated that some 25 major city agencies were involved in the City plan. “Each of these agencies have [sic\ a role in the success of the City meeting the goals of this plan.” One of the City agencies identified in the report was the Planning Department, the department that approved the zoning approvals in this case and referred its recommendation to the City Council. The description of the Planning Department under the City’s waste management plan was as follows: “The City Planning Department prepares and maintains a general plan for the development of the City including elements such as land use and service systems. Privately-owned property is regulated through zoning regulations, specific plan ordinances, and State laws. Responsible for approval of sites to be used for *1146 recycling and solid waste facilities. This agency is responsible for the development of the City’s General Plan. The CiSWMPP will also serve as the primary reference document for the Solid Waste Component of the Infrastructure Element of the General Plan.” (Italics added.)
What the City recognized then, but from which it now tries to distance itself, is a very simple fact of City life. Many parts of the City government work together in a program as comprehensive as the City’s waste management plan. To be sure, the department of building and safety, acting as the LEA under the Act, has responsibility for issuing various permits for the actual facilities built. (Pub. Resources Code, § 43209.) But other City departments also have their role. As expressly stated in the City’s own waste management plan, the Planning Department has to give its approval under zoning and other laws to allow the facility to be built or expanded. Without this approval, there would be no Bradley Landfill expansion. To separate legally the Planning Department zoning approval process and the City Council’s attendant approval, and cast them aside from the permits issued by, and other statutory obligations of, the department of building and safety acting as the LEA is to ignore the reality of what happened and what will continue to happen under the Act. The City’s permit approval and siting of the challenged facilities were not ends in themselves approved solely for their own sake, devoid of a larger context. Permits issue and facilities arise for a purpose. In my opinion, because the zoning and siting decisions were components of the City’s broader, legally mandated waste management program for which it receives state funds, section 11135 applies.

Conclusion

California has been a leader in the enactment of antidiscrimination laws for over 100 years. Section 11135 is a fairly straightforward statute, banning discrimination in programs and activities that receive state funds. The City receives state funds to help administer its responsibilities under the Act. State money is combined with $1,762,618 of the City’s own funds so that the City’s department of building and safety can as the LEA fulfill the City’s statutory duties. The expansion of the Bradley Landfill can only be accomplished by the zoning approvals issued by the Planning Department and approved by the City Council. Only then can the LEA discharge its responsibilities under the Act. To treat the actions of the City Council and the Planning Department here as somehow legally detached from the other parts of the City’s waste management program ignores both reality and the City’s own description of its waste management program.
*1147 In my view the trial court erred in granting summary adjudication of appellant’s section 11135 claim and for that reason and as stated in part 2 of its Discussion of the majority’s opinion, I would reverse the order granting summary judgment.
Appellant’s petition for review by the Supreme Court was denied December 18, 2013, S214336.

 Except as otherwise stated, all statutory references are to the Government Code.

 The breadth of antidiscrimination statutes is matched only by their longevity. The original version of what is now known as the Unruh Civil Rights Act was enacted in 1901 and then reenacted in 1905 as Civil Code section 51. (2 Kerr, The Codes of Cal.: Civil Code (1905) §51.)

 The legislation is currently awaiting signature by the Governor. (Cal. Legis. Information Web site <http://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml> [as of Sept. 20, 2013].) 

 Public Resources Code section 40001, subdivision (a) states, “The Legislature declares that the responsibility for solid waste management is a shared responsibility between the state and local governments. The state shall exercise its legal authority in a manner that ensures an effective and coordinated approach to the safe management of all solid waste generated within the state and shall oversee the design and implementation of local integrated waste management plans.”

 Public Resources Code section 43202 states, “An enforcement agency may be designated by the local governing body and certified by the board to act to carry out this chapter within each jurisdiction. If an enforcement agency is not designated and certified, the board, in addition to its other powers and duties, shall be the enforcement agency within the jurisdiction . . . .”

 “The local enforcement agency has broad duties and powers ([Pub. Resources Code,] § 43209) including the investigation of permit violations (Cal. Code Regs., tit. 14, § 18303), temporary suspension of permits ([Pub. Resources Code,] § 44305, subd. (a)), issuance of cease-and-desist orders ([Pub. Resources Code,] § 45005), assessment of civil penalties ([Pub. Resources Code,] § 45011), issuance of notices and orders requiring permit violations be remedied ([Pub. Resources Code,] § 45000, subd. (a); Cal. Code Regs., tit. 14, § 18304), and in the absence of correction, initiation of judicial proceedings. (Cal. Code Regs., tit. 14, § 18304.)” (San Elijo Ranch, Inc. v. County of San Diego (1998) 65 Cal.App.4th 608, 613 [76 Cal.Rptr.2d 601].)

 Section 43218 states, “Each enforcement agency shall inspect each solid waste facility within its jurisdiction at least one time each month and shall file, within 30 days of the inspection, a written report in a format prescribed by the board.”

 The Los Angeles County Metropolitan Transportation Authority is an example of a governmental entity that is comprised of representatives from a number of different municipalities. Its board of directors includes the Mayor of Los Angeles, two members of the Los Angeles City Council, five members of the Los Angeles County Board of Supervisors, and the mayor or City Council member from four smaller cities in Los Angeles County. (L.A. County Metropolitan Transportation Authority Web site <http://www.metro.net/about/board/executives> [as of Sept. 20, 2013].)